Daniel Srourian, Esq. (SBN 285678)
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr. Suite 200
Beverly Hills, CA 90210
Telephone: (213) 474-3800
Facsimile: (213) 471-4160
Email: daniel@slfla.com

Tyler J. Bean*
Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: ssingh@sirillp.com

*pro hac vice admission anticipated*

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NICOLE FIRLEJ** and **HANIA ROUHANI**, individually and on behalf of all others similarly situated, | No. 2:26-cv-01030 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| **PETROSIAN ESTHETIC ENTERPRISES, LLC** and **SEV LASER AESTHETICS CHICAGO, LLC**, | |
| Defendants. | |

**1**

**CLASS ACTION COMPLAINT**

Plaintiffs Nicole Firlej and Hania Rouhani ("Plaintiffs"), individually and on behalf of all similarly situated persons, allege the following against Defendants Petrosian Esthetic Enterprises, LLC and SEV Laser Aesthetics Chicago, LLC (collectively, "SEV" or "Defendants"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by their counsel and review of public documents as to all other matters:

## I.      INTRODUCTION

1.      Information concerning an individual's health is among the most sensitive, and closely guarded information in our society.

2.      The unwanted disclosure of such information can be enormously harmful. It can result in discrimination in the workplace, and denial of insurance coverage. And, if people are unable to trust that their sensitive health information will be kept confidential, they are much less likely to seek medical care when they need it most.

3.      SEV is a medical provider offering aesthetic services. With medical accreditation and a staff of registered nurses and laser technicians, SEV offers "the highest caliber of aesthetic services" at over 70 locations nationwide.[1]

---

[1] *About*, SEV LASER, https://sevlaser.com/about/ (last visited Jan. 27, 2026).

**CLASS ACTION COMPLAINT**

4.      Through the SEV website - https://sevlaser.com/ - (the "Website"), patients can schedule and modify medical appointments with SEV's practitioners.

5.      Unfortunately, unbeknownst to Plaintiffs and other visitors to the Website, their private personal and health information was not actually being kept private. Instead, through SEV's patient scheduling website, Defendants collected and transmitted personally identifiable, sensitive health information pertaining to Plaintiffs' and other patients' upcoming appointments, including the fact that the patient is scheduling an appointment with an aesthetician and the reason for the patient's appointment (collectively, "Sensitive Health Information") to unauthorized third parties, including Alphabet, Inc. ("Google"),  through the use of surreptitious online tracking tools.

6.      Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives. This information is then used to fuel for a massive, targeted advertising enterprise.

7.      Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. If Google receives information that a person is concerned about a potential health-related issue (e.g., dermatological care), it will collect that information and allow its clients to

**3**
**CLASS ACTION COMPLAINT**

use that information to stream ads related to health care products and services to that person's computers and smartphones.

8.    Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

9.    But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website.  The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

**4**

**CLASS ACTION COMPLAINT**

10.    In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

11.    Defendants are some of the companies that have chosen to prioritize their marketing efforts and profits over their patients' privacy by installing Google's Tracking Tools on their Website.

12.    Health information is regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[2] Accordingly, Defendants' disclosure of Plaintiffs' and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

13.    As a result of Defendants' conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third

_____

[2] 18 U.S.C. § 1320d-(6).

**5**

**CLASS ACTION COMPLAINT**

parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

14. Therefore, Plaintiffs seek, on behalf of themselves and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendants: Invasion of Privacy; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq.*; and violations of the California Invasion of Privacy Act, Cal. Pen. Code § 360, *et seq.*

## II. PARTIES

*Plaintiff Nicole Firlej*

15. Plaintiff Firlej is a citizen of the State of Illinois, residing in Cook County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

16. In or around September 2025 and again in early January 2026, Plaintiff Firlej utilized the Website on her personal electronic device to schedule a wax appointment with SEV's clinic in Chicago, IL, in the same manner as depicted in §IV(d), *infra.*

17. Unbeknownst to Plaintiff Firlej, the Website transmitted the Sensitive Health Information that she input into her appointment form, including the reason for her appointment.

**6**

**CLASS ACTION COMPLAINT**

18.    Plaintiff Firlej never authorized SEV to disclose any aspect of her communications with SEV through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

19.    On every occasion that she visited the Website, Plaintiff Firlej possessed an account with Google, and she accessed the Website while logged into her Google account on the same device. Plaintiff Firlej also provided her Google email address to SEV through the Website, and received emails related to her appointment with SEV to her Google email account.

20.    After providing her Sensitive Health Information to Defendants through the Website, Plaintiff Firlej immediately began seeing targeted online advertisements for cosmetic services and products.

***Plaintiff Hania Rouhani***

21.    Plaintiff Rouhani is a citizen of the State of California, residing in Los Angeles County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

22.    In or around January 2026, Plaintiff Rouhani utilized the Website on her personal electronic device to schedule a laser appointment with SEV's clinic in West Hollywood, CA, in the same manner as depicted in §IV(d), *infra*.

23.    Unbeknownst to Plaintiff Rouhani, the Website transmitted the Sensitive Health Information that she input into her appointment form, including the reason for her appointment.

**7**

**CLASS ACTION COMPLAINT**

24.    Plaintiff Rouhani never authorized SEV to disclose any aspect of her communications with SEV through the Website to third parties, including the Sensitive Health Information that she provided through the Website.

25.    On every occasion that she visited the Website, Plaintiff Rouhani possessed an account with Google, and she accessed the Website while logged into her Google account on the same device. Plaintiff Rouhani also provided her Google email address to SEV through the Website, and received emails related to her appointment with SEV to her Google email account.

26.    After providing her Sensitive Health Information to Defendants through the Website, Plaintiff Rouhani immediately began seeing targeted online advertisements for cosmetic services and products.

*Defendant Petrosian Esthetic Enterprises, LLC*

27.    Defendant Petrosian Esthetic Enterprises, LLC is a limited liability corporation incorporated in the State of California with its principal place of business at 2921 W. Burbank Blvd, Burbank, CA 91505  in Los Angeles County.

*Defendant SEV Laser Aesthetics Chicago, LLC*

28.    Defendant SEV Laser Aesthetics Chicago, LLC is a limited liability corporation incorporated in the State of Delaware with its principal place of business at 2320 Lincoln Ave., Chicago, IL 60614 in Cook County.

### III.    JURISDICTION AND VENUE

**CLASS ACTION COMPLAINT**

29. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because many putative class members are citizens of a different state than Defendants. Indeed, Defendants represent on its Website that it provides services through more than 70 locations the United States.[3] Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

30. This Court has general personal jurisdiction over Defendant Petrosian Esthetic Enterprises, LLC because it is headquartered in and maintains its principal places of business in the State of California.

31. Further, this Court has specific personal jurisdiction over Defendant SEV Laser Aesthetics Chicago, LLC because the acts giving rise to Plaintiff Firlej's claims, including decisions regarding management of the Website and the incorporation of the Tracking Tools were purposefully directed from this District. Plaintiffs' claims arise directly out of and relate to Defendants' California-based

---

[3] *About*, SEV LASER, https://sevlaser.com/about/ (last visited Jan. 27, 2026).

**9**

**CLASS ACTION COMPLAINT**

conduct, and the exercise of personal jurisdiction over Defendant SEV Laser Aesthetics Chicago, LLC comports with traditional notions of fair play and substantial justice.

32. Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by the Defendants' governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiffs' and Class Members' Sensitive Health Information; Defendants Petrosian Esthetic Enterprises, LLC's principal place of business is located in this District; Defendants collect and redistribute Plaintiffs' and Class Members' Sensitive Health Information in this District; and Defendants caused harm to Plaintiff Rouhani and Class Members residing in this District.

## IV.   FACTUAL ALLEGATIONS

### A. DEFENDANTS' USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### i.   Google's Mass Advertising Surveillance Operation

33. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[4]

---

[4] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Jan. 27, 2026).

**CLASS ACTION COMPLAINT**

In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[5]

34.    Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[6] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[7]

35.    Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[8]

---

[5] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Jan. 27, 2026).

[6] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Jan. 27, 2026).

[7] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Jan. 27, 2026).

[8] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Jan. 27, 2026).

**11**

**CLASS ACTION COMPLAINT**

36.     Google also admits that it uses the information collected from third party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[9]

37.     While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's data collection practices referenced above could not give Plaintiffs and Class Members any reason to think that Defendants were part of Google's surveillance network. Moreover, as Defendants do not disclose their use of Google's Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

38.     Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[10] With these advertising profiles, Google can sell hyper-precise

---

[9] *Id.*

[10] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

**12**

**CLASS ACTION COMPLAINT**

advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[11]

39.　Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[12] and Google trackers are present on 74-percent of all web traffic.

40.　Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

　　　a. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[13] In fact, Google advertising trackers were found on 73-percent of pornography websites.[14]

---

[11] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Jan. 27, 2026).

[12] Narseo Vallina-Rodriguez & Srikanth Sundaresan*, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Jan. 27, 2026).

[13] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[14] *Id.*

**13**

**CLASS ACTION COMPLAINT**

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[15]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[16] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[17]

41.    This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[18]

---

[15] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[16] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Jan. 27, 2026).

[17] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Jan. 27, 2026).

[18] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Jan. 27, 2026).

**14**

**CLASS ACTION COMPLAINT**

42.     In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[19]

43.     When website operators, like Defendants, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy. For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[20]

44.     Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[21] And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[22]

---

[19] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 27, 2026) ("Google Analytics gives you the tools, free of charge").

[20] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Jan. 27, 2026).

[21] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[22] *Id.*

**15**

**CLASS ACTION COMPLAINT**

45.    Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[23]

### ii.    Pixels Can Record Almost Every Interaction Between a User and a Website

46.    In order to use Google's Business Tools, Defendants installed Google's Tracking Tools, including tracking Pixels, onto the Website.

47.    Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[24]

---

[23] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[24] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Jan. 27, 2026).

**16**

**CLASS ACTION COMPLAINT**

48.   Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form—all transmitted in real-time as the user navigates a website.[25]

49.   But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[26]

[25] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Jan. 27, 2026); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Jan. 27, 2026).

[26] *Lurking Beneath the Surface, supra* note 24.

**CLASS ACTION COMPLAINT**

### iii. The Pixels Installed on the Website Transmit Personally Identifiable Information and Protected Health Information to Google

50. Every website is hosted by a computer "server" that holds the website's contents.

51. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

52. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

53. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the

**18**

**CLASS ACTION COMPLAINT**

user's device.[27] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[28] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[29]

54.    When a Google user logs onto their account, their web browser records a Google tracking cookie.[30] This cookie includes a specific line of code that links the web browser to the user's Google account.[31]

55.    Google's Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user.  The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

---

[27] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Jan. 27, 2026).
[28] *Id.*
[29] *Id.*
[30] Cyphers & Gebhart, *supra* note 10.
[31] *Id.*

**19**

**CLASS ACTION COMPLAINT**

56.     Simultaneously, the Google Pixels, like those installed on the Website, request identifying information from any Google cookies previously installed on the user's web browser.

57.     The Pixels then combine the data received from the browser with the data acquired from the cookie, and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels to the user's identity, via the user's Google profile.  Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

58.     A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[32] When these users visit a website, like those on which the Website has been installed, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

59.     However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes

---

[32] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Jan. 27, 2026) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Jan. 27, 2026).

**CLASS ACTION COMPLAINT**

sophisticated data tracking methods to identify even those few users who do not have a Google account.

60.    Google's Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

61.    An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[33] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[34] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

### iv.    Defendants Disclosed Plaintiffs' and Class Members' Sensitive Health Information to Google.

62.    To schedule or re-schedule an appointment with their clinicians, Plaintiffs and Class Members were required to complete a scheduling form through the Website.

---

[33] Cyphers & Gebhart, *supra* note 10.

[34] *Id.*

**21**

**CLASS ACTION COMPLAINT**

63.    Unbeknownst to Plaintiffs and Class Members, Defendants intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information communicated through the Website to third parties, including Google.

64.    The following screenshots ("Figures 1-4") depict the network transmissions made by the Google Tracking Tools installed on the Website. The information provided in Figures 1-4 is exemplar information collected on the Website, and is not either Plaintiffs' information, but the Tracking Tools installed on the Website collected from the Plaintiffs information that in sum and substance was similar to what is shown in the Figures. As Figures 1-4 show, when patients browse Defendants' services and schedule an appointment on the Website, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website include the fact that the patient has scheduled an appointment and the reason for the patient's appointment.

65.    Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiffs to their identities. The following screenshot shows that the Google Pixel on the Website transmitted the identifier number attached to Google's 'cid' and 'sid' cookies, which identify the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's

**22**

**CLASS ACTION COMPLAINT**

language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.



*Figure 1. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users browse Defendants' services.*

**CLASS ACTION COMPLAINT**



*Figure 2. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users browse appointment options.*

**CLASS ACTION COMPLAINT**



*Figure 3. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users browse appointment times.*

**CLASS ACTION COMPLAINT**

*Figure 4. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users book an appointment.*

66.    In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage.[35] The Google Pixels on

---

[35]    *Automatically    Collected    Events*, GOOGLE    ANALYTICS    HELP, https://support.google.com/analytics/answer/9234069 (last visited Jan. 27, 2025).

**CLASS ACTION COMPLAINT**

the Website were purposefully configured to collect and transmit additional user data, including the information entered by patients on their appointment scheduling forms.

67.     Moreover, because the Google 'cid' and 'sid' cookies are sufficient to identify the subject of the Sensitive Health Information collected through the Tracking Tools, either scheduling or re-scheduling an appointment independently constitute a disclosure of the user's Sensitive Health Information since these identifier cookies are transmitted contemporaneously with the data collected and transmitted by the Tracking Tools in both use cases.

68.     By installing third-party Tracking Tools, including tracking Pixels, on the Website, further configuring those Pixels to collect their patients' Sensitive Health Information, and/or by directing their patients to communicate through the Website despite having actual or constructive knowledge of the disclosures caused by the Tracking Tools,  Defendants knowingly and intentionally caused Plaintiffs' and Class Members' Sensitive Health Information to be transmitted to third parties, including Google.

**B. DEFENDANTS DISCLOSED PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT**

> **i.  Defendants failed to inform Plaintiffs and Class Members of their disclosure of Plaintiffs' and Class Members' Sensitive Health Information, in violation of their Notice of Privacy Practices**

**CLASS ACTION COMPLAINT**

69.     Defendants breached Plaintiffs' and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google. Specifically, Plaintiffs and Class Members had a reasonable expectation of privacy that Defendants would not disclose their Sensitive Health Information to third parties. Defendants did not inform Plaintiffs that they were sharing their Sensitive Health Information with third parties, including Google.

70.     By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Defendants violated Plaintiffs' and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

71.     Despite never telling users like Plaintiffs and Class Members, Defendants allowed third parties such as Google to intercept Plaintiffs' and Class Members' Sensitive Health Information and use it for advertising purposes.

**ii.     The Tracking Tools Used by Defendants Were Imperceptible to Plaintiffs and Class Members**

72.     The Tracking Tools installed on the Website were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on the Website.

**CLASS ACTION COMPLAINT**

73.     Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

74.     Plaintiffs and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

75.     Because Plaintiffs and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to Google, they could not and did not consent to Defendants' conduct.

## C. DEFENDANTS WERE ENRICHED BY THEIR DISCLOSURE OF PLAINTIFFS' AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### i.    Defendants Received Material Benefits in Exchange for Plaintiffs' Sensitive Health Information

76.     As explained, *supra*, users of Google's Business Tools, like Defendants, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on their website.

77.     Upon information and belief, Defendants, as users of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiffs' and Class Members' Sensitive Health Information.

### ii.    Plaintiffs' and Class Members' Data Had Financial Value

**29**

**CLASS ACTION COMPLAINT**

78.     Moreover, Plaintiffs' and Class Members' Sensitive Health Information has value and Defendants' disclosure and interception of that Sensitive Health Information harmed Plaintiffs and the Class.

79.     According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[36]

80.     Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

81.     Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[37] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to

---

[36] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Jan. 27, 2025).

[37] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

**30**

**CLASS ACTION COMPLAINT**

$250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[38]

82.    Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

83.    The unauthorized disclosure of Plaintiffs' and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

## D. DEFENDANTS' USE OF THE TRACKING TOOLS VIOLATES HIPAA.

84.    The disclosure of Plaintiffs' and Class Members' Private Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[39]

85.    The HIPAA Privacy Rule sets forth policies to protect all Individually

---

[38] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

[39] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Jan. 27, 2025).

**31**

**CLASS ACTION COMPLAINT**

Identifiable Health Information ("IIHI") and Personal Health Information ("PHI") that is held or transmitted by a covered entity such as Defendants.

86. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

87. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

88. There are 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes Personal Health Information ("PHI").

**32**

**CLASS ACTION COMPLAINT**

89. Additionally, information revealing that an individual is receiving medical service or treatment is PHI. In its 2012 Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the U.S. Department of Health and Human Services (HHS) instructed health care providers that, while identifying information alone is not necessarily PHI if it is part of a public source uncoupled from health data (e.g., a phone book), "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."

90. HHS has repeatedly instructed covered entities that patient status is protected by the HIPAA Privacy Rule:

a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

91. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited

**33**

**CLASS ACTION COMPLAINT**

way, i.e., to perform analysis on data key to their operations.

92.  When the information that a regulated entity collects through technologies or discloses to third parties (e.g., tracking technology vendors like Google) includes PHI, the protections under the HIPAA Privacy Rule apply.[40]

93.  Put simply, HIPAA covered entities such as Defendants are not permitted to use tracking technology tools (like Pixels) in a way that exposes an individual's PHI to any third party without that individual's express and informed consent.

94.  In a joint letter to approximately 130 hospital systems and telehealth provides, the Office for Civil Rights (OCR) at the HHS and Federal Trade Commission (FTC) acknowledged that tracking technology tools "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[41] Disclosures to third parties by these tracking tools can "reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[42]

---

[40] *See Letter regarding Use of Online Tracking Technologies*, FEDERAL TRADE COMMISSION, available at: https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited Jan. 27, 2025).
[41] *Id.*
[42] *Id.*

**CLASS ACTION COMPLAINT**

95. The HHS and FTC warn that the "[i]mpermissible disclosures of an individual's [PHI] to third parties may result in a wide range of harms to an individual or others," including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[43]

96. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[44]

97. Consistent with this restriction, the HHS has issued marketing guidance that provides:

> With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.[45]

98. The HIPAA Privacy Rule further requires any "covered entity"—which includes Defendants—to maintain appropriate safeguards to protect the

---

[43] *Id.*

[44] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[45] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Jan. 27, 2025).

**35**

**CLASS ACTION COMPLAINT**

privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

99.    In contravention of HIPAA,  Defendant failed to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information[,]" 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

100.   Defendants failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendants in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

**36**

**CLASS ACTION COMPLAINT**

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f. Failing to effectively train their workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

101. Defendants violated the Privacy Rule by providing patient information to third parties without first obtaining express consent from Plaintiffs and Class Members.

## E. PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

102. At all times when Plaintiffs and Class Members provided their Sensitive Health Information to Defendants, they each had a reasonable expectation that the information would remain confidential and that Defendants would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with health care.

103. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before

**CLASS ACTION COMPLAINT**

a company collects and shares that individual's data to be one of the most important privacy rights.

104.   For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[46]

105.   Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[47] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[48]

106.   Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiffs and Class Members.

---

[46] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Jan. 27, 2025).

[47] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[48] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

**38**

**CLASS ACTION COMPLAINT**

## V.    TOLLING AND ESTOPPEL

107.    Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the incorporation of Google's Tracking Tools onto the Website.

108.    The Tracking Tools on the Website were and are invisible to the average website visitor.

109.    Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

110.    Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

111.    Defendants had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiffs and Class Members, that by scheduling appointments through the Website, Plaintiffs' and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

112.    Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' Sensitive Health Information. In fact, to the present, Defendants have not conceded, acknowledged, or otherwise indicated to their patients that they have disclosed or

**39**

**CLASS ACTION COMPLAINT**

released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

113.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

114.    The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of this Complaint.

## VI.    CLASS ALLEGATIONS

115.    This action is brought by the named Plaintiffs on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

116.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**The Nationwide Class**

All natural persons who used the Website to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

117.    In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate California and Illinois Subclasses, which is defined as follows:

**California Subclass**

**40**

**CLASS ACTION COMPLAINT**

All natural persons residing in the State of California who used the Website to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party.

### Illinois Subclass

All natural persons residing in the State of Illinois who used the Website to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party.

118. The Nationwide Class and California and Illinois Subclasses are collectively referred to herein as the "Class." Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendants and their parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

119. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

120. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is

**41**

**CLASS ACTION COMPLAINT**

generally ascertainable by appropriate discovery and is in the exclusive control of Defendants.

121. **Commonality.** Common questions of law or fact arising from Defendants' conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendants had a duty to protect the Sensitive Health Information of Plaintiffs and Class Members;

b) Whether Defendants had duties not to disclose the Sensitive Health Information of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

d) Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Sensitive Health Information was being disclosed without their consent;

e) Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f) Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g) Whether Defendants violated the statutes asserted as claims in this Complaint;

**42**

**CLASS ACTION COMPLAINT**

h)  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

i)  Whether Defendants knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j)  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Sensitive Health Information.

122. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the Tracking Tools.

123. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

**CLASS ACTION COMPLAINT**

124.   **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiffs' and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

125.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

**CLASS ACTION COMPLAINT**

126. Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

127. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a) Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

    b) Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

    c) Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

    d) Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Sensitive Health Information would be disclosed to third parties;

    e) Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

    f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

**CLASS ACTION COMPLAINT**

128.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

## COUNT I
## COMMON LAW INVASION OF PRIVACY
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California Subclass)*

129.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 128 as if fully set forth herein.

130.    Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their highly personal and statutorily protected Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration and/or unauthorized sharing of their communications without Plaintiffs' and Class Members' knowledge or consent, and (3) preventing the distribution of their Sensitive Health Information through the advertising network of Google, the largest internet advertiser in the world.

131.    Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendants via the Website and the communications platforms and services therein.

132.    Plaintiffs and Class Members communicated Sensitive Health

**46**

**CLASS ACTION COMPLAINT**

Information that they intended for only Defendants to receive and that they understood Defendants would keep private and secure.

133. Defendants' disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

134. Moreover, Defendants' knowing disclosure of Plaintiffs' Sensitive Health Information to Google, the largest advertiser in the world, to be used for advertising purposes, constitutes a publication of private facts.

135. Plaintiffs and Class Members had a reasonable expectation of privacy given Defendants' Privacy Policies and other representations.

136. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

137. Defendants' disclosure of Plaintiffs' and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

138. As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

**47**

**CLASS ACTION COMPLAINT**

139. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to compensatory and/or nominal damages.

140. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

141. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

142. Plaintiffs also seek such other relief as the Court may deem just and proper.

## COUNT II
### NEGLIGENCE
*(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California and Illinois Subclass(es))*

143. Plaintiffs repeat and reallege the allegations contained in in paragraphs 1 through 142 as if fully set forth herein.

144. Through their use of the Website, Plaintiffs and Class Members provided Defendants with their Sensitive Health Information, believing such

**48**

**CLASS ACTION COMPLAINT**

Information would be kept confidential.

145.    By collecting and storing this data, Defendants had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

146.    Defendants negligently failed to take reasonable steps to protect Plaintiffs' and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

147.    Defendants further negligently omitted to inform Plaintiffs and the Class that they would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

148.    Defendants knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Sensitive Health Information to Defendants had they known that Defendants intended to use that Information for unlawful purposes.

149.    Defendants' conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

150.    Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

151.    Defendants' negligent conduct is ongoing, in that it still holds the

**CLASS ACTION COMPLAINT**

Sensitive Health Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California and Illinois Subclass(es))*

152.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 151 as if fully set forth herein.

153.   When Plaintiffs and Class Members provided their Sensitive Health Information to Defendants in exchange for health-related services, they entered into an implied contract pursuant to which Defendants agreed to safeguard and not disclose the Sensitive Health Information without consent.

154.   Plaintiffs and Class Members accepted Defendants' offers and provided their Sensitive Health Information to Defendants.

155.   Plaintiffs and Class Members would not have entrusted Defendants with their Sensitive Health Information in the absence of an implied contract between them and Defendants obligating Defendants to not disclose Sensitive Health Information without consent, including as expressed through, *inter alia*,

**50**

**CLASS ACTION COMPLAINT**

Defendants' Privacy Policies.

156. Defendants breached these implied contracts by disclosing Plaintiffs' and Class Members' Sensitive Health Information to third parties like Google.

157. As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

158. Plaintiffs and Class Members would not have used Defendants' services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

159. Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendants' breaches of implied contract.

## COUNT IV
## UNJUST ENRICHMENT
### *(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the California and Illinois Subclass(es))*

160. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 159 as if fully set forth herein.

161. Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

162. Plaintiffs and Class Members conferred a monetary benefit on Defendants in exchange for healthcare related services. Specifically, they provided

**51**

**CLASS ACTION COMPLAINT**

their Sensitive Health Information to Defendants which Defendants then utilized for marketing and advertising purposes, as described, *supra*.

163. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from the Sensitive Health Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

164. In particular, Defendants enriched themselves by obtaining the inherent value of Plaintiffs' and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiffs' and Class Members' Sensitive Health Information.

165. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the privacy of their patients' Sensitive Health Information.

166. Under the principles of equity and good conscience, Defendants should not be permitted to retain such benefits obtained by their surreptitious collection and transmission of Plaintiffs' and Class Members' Sensitive Health Information.

167. If Plaintiffs and Class Members knew that Defendants had not reasonably secured their Sensitive Health Information, they would not have agreed

**CLASS ACTION COMPLAINT**

to provide their Sensitive Health Information to Defendants.

168.    Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

169.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

170.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

**COUNT V**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS**
**PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq*.**
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the***
***California and Illinois Subclass(es))***

171.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 170 as if fully set forth herein.

172.    The ECPA protects both sending and receipt of communications.

173.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

**53**
**CLASS ACTION COMPLAINT**

174.   The transmissions of Plaintiffs' Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

175.   <u>Electronic Communications</u>. The transmission of Sensitive Health Information between Plaintiffs and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

176.   <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

177.   <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

**CLASS ACTION COMPLAINT**

178. <u>Electronical, Mechanical or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    Plaintiffs' and Class Members' browsers;

b.    Plaintiffs' and Class Members' computing devices;

c.    Defendants' web-servers; and

d.    The Pixel code deployed by Defendants to effectuate the sending and acquisition of patient communications.

179. By utilizing and embedding the Pixels on the Website, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

180. Specifically, Defendants intercepted Plaintiffs' and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Google.

181. Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Health Information, including their full names, name of the medical provider that

**55**

**CLASS ACTION COMPLAINT**

they were visiting, the reason for their appointment, their phone numbers, and their insurance provider.

182. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

183. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

184. Unauthorized Purpose. Defendants intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

185. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

56

**CLASS ACTION COMPLAINT**

186. Defendants are not parties to the communication based on their unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendants are a party, Defendants' simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Sensitive Health Information does not qualify for the party exemption.

187. Defendants' acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a.    Invasion of privacy;

b.    Breach of implied contract;

c.    Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3);

d.    Violations of the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code § 360, *et seq.*

188. Defendants' conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiffs and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google without user authorization.

**57**

**CLASS ACTION COMPLAINT**

189.    Defendants are not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications about their Sensitive Health Information on the Website, because they used its participation in these communications to improperly share Plaintiffs' and Class Members' Private Information with Google and other third-parties that did not participate in these communications, that Plaintiffs and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiffs and Class Members did not consent to receive their Sensitive Health Information.

190.    As such, Defendants cannot viably claim any exception to ECPA liability.

191.    Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendants' invasion of privacy in that:

    a.    Learning that Defendants have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

    b.    Defendants received substantial financial benefits from their use of Plaintiffs' and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiffs or Class Members;

    c.    Defendants received substantial, quantifiable value from their use of Plaintiffs' and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiffs or Class Members;

**58**

**CLASS ACTION COMPLAINT**

d. Defendants failed to provide Plaintiffs and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiffs' and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendants making such Sensitive Health Information, which Plaintiffs and Class Members intended to remain private, no longer private.

192. Defendants intentionally used the wire or electronic communications to increase their profit margins. Defendants specifically used the Tracking Tools to track and utilize Plaintiffs' and Class Members' Sensitive Health Information for financial gain.

193. Defendants were not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

194. Plaintiffs and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading their privacy via the Pixels.

195. Any purported consent that Defendants may claim they received from Plaintiffs and Class Members was not valid.

196. In sending and acquiring the content of Plaintiffs' and Class Members' communications relating to their use of the Website, Defendants' purpose was tortious, criminal, and designed to violate federal and state legal provisions

**CLASS ACTION COMPLAINT**

including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

197.   As a result of Defendants' violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT VI**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**("CIPA")**
**Cal. Pen. Code § 360, *et seq*.**
***(On Behalf of Plaintiff Rouhani and the California Subclass)***

198.   Plaintiff Rouhani repeats and realleges the allegations contained in paragraphs 1 through 197 as if fully set forth herein.

199.   The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

200.   Under CIPA, it is unlawful to:

**60**
**CLASS ACTION COMPLAINT**

a. "[W]illfully and *without the consent of all parties to the communication*, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

b. "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

c. "[A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

201.    At all relevant times, Defendants aided, employed, agreed with, and conspired with Google, and likely other third parties, to track and intercept Plaintiff Rouhani's and California Subclass Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Google to eavesdrop on and intercept in real-time the content of intercept Plaintiff Rouhani's and California Subclass Members' private communications with Defendants.

202.    The content of those conversations included Sensitive Health Information. Through Defendants' installation and configuration of the Tracking Tools on the Website, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff Rouhani and California Subclass Members.

**CLASS ACTION COMPLAINT**

203.   Defendants intentionally inserted electronic devices into the Website that, without the knowledge and consent of Plaintiff Rouhani and California Subclass Members, transmitted the substance of their confidential communications with Defendants to third parties.

204.   Defendants willingly facilitated Google's and other third parties' interception and collection of Plaintiffs' and Class Members' Sensitive Health Information by embedding the Tracking Tools on the Website, thereby assisting Google's eavesdropping.

205.   The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools fall under the broad catch-all category of "any other manner":

a.  The computer codes and programs Google and other third parties used to track intercept Plaintiff Rouhani's and California Subclass Members' communications while they were navigating the Website;

b.  Plaintiff Rouhani's and California Subclass Members' internet browsers;

c.  Plaintiff Rouhani's and California Subclass Members' computing and mobile devices;

d.  Google's web and ad servers;

e.  The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff Rouhani's and California Subclass Members' communications while they were using a web browser to access or navigate the Website; and

f.  The computer codes and programs used by Google and other third parties to effectuate their tracking and interception of Plaintiff Rouhani's and

**62**

**CLASS ACTION COMPLAINT**

California Subclass Members' communications while they were using a browser to visit the Website.

206.    As demonstrated hereinabove, Defendants violated CIPA by aiding and permitting third parties, including Google, and their agents, employees, and contractors, to receive Plaintiff Rouhani's and California Subclass Members' Sensitive Health Information in real time, through the Website, without obtaining consent.

207.    By disclosing Plaintiff Rouhani's and California Subclass Members' Sensitive Health Information, Defendants violated Plaintiff Rouhani's and California Subclass Members' statutorily protected right to privacy.

208.    As a result of Defendants' violation of the CIPA, Plaintiff Rouhani and California Subclass Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at trial, statutory damages, attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages.

## COUNT VII
### VIOLATIONS OF THE ILLINOIS EAVESDROPPING ACT
### 720 Ill. Comp. Stat. 5/14-1, *et seq*.
### *(On Behalf of Plaintiff Firlej and the Illinois Subclass)*

209.    Plaintiff Firlej repeats and realleges the allegations contained in paragraphs 1 through 209 as if fully set forth herein.

210.    Under the Illinois Eavesdropping Act, 720 ILCS 5/14, *et seq.*, it is unlawful for a person to knowingly and intentionally "[u]se an eavesdropping

**63**

**CLASS ACTION COMPLAINT**

device, in a surreptitious manner, for the purpose of transmitting or recording all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation." 720 ILCS 5/14-2(a)(2).

211. Under the Illinois Eavesdropping Act, an injured party is entitled to civil remedies against both the eavesdropper and the eavesdropper's principal. 720 ILCS 5/14-6.

212. Private Electronic Communication: The Illinois Eavesdropping Act defines "private electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system, when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS 5/14-1(e).

213. Eavesdropping Devices: The Illinois Eavesdropping Act defines an "eavesdropping device" as "any device capable of being used to hear or record oral conversations or intercept or transcribe electronic communications whether such conversation or electronic communication is conducted in person, by telephone, or by any other means." 720 ILCS 5/14-1(a). The following constitute eavesdropping devices within the meaning of 720 ILCS 5/14-1(a):

**CLASS ACTION COMPLAINT**

a.    Plaintiff Firlej's and Illinois Subclass Members' browsers;

b.    Plaintiff Firlej's and Illinois Subclass Members' computing devices;

c.    Defendants' web-servers; and

d.    The Pixel code deployed by Defendants to effectuate the sending and acquisition of the Sensitive Health Information.

214.    Surreptitious: The Illinois Eavesdropping Act defines "surreptitious" as "obtained or made by stealth or deception, or executed through secrecy or concealment." 720 ILCS 5/14-1(g).

215.    Eavesdropper: The Illinois Eavesdropping Act defines an "eavesdropper" as "any person, including any law enforcement officer and any party to a private conversation, who operates or participates in the operation of any eavesdropping device contrary to the provisions of [the Illinois Eavesdropping Act] or who acts as a principal . . . ." 720 ILCS 5/14-1(b).

216.    Under the Illinois Eavesdropping Act, the information Plaintiff Firlej and Illinois Subclass Members sent and received while using the Website, including their browsing information and Sensitive Health Information, constitutes private electronic communications.

217.    Defendants were, and continue to be, eavesdroppers under the Illinois Eavesdropping Act because it operated or participated in the operation of an eavesdropping device. Specifically, Defendant utilized the Tracking Tools to intercept the content of Plaintiff Firlej's and Illinois Subclass Members' private electronic communications on the Website. Defendant did not obtain consent from

**65**

**CLASS ACTION COMPLAINT**

Plaintiff Firlej or Illinois Subclass Members prior to intercepting the private electronic communications, in violation of 720 ILCS 5/14-2(a)(2).

218. The unlawful conduct of Defendants, as alleged herein, has injured Plaintiff Firlej and Illinois Subclass Members and entitles them to actual and punitive damages. 720 ILCS 5/14-6(b), (c).

219. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause injury to Plaintiff Firlej and Illinois Subclass Members. Because Defendants' unlawful conduct is ongoing, Plaintiff Firlej and Illinois Subclass Members are entitled to an injunction prohibiting Defendants from further eavesdropping. 720 ILCS 5/14-6(a).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendants as follows:

A.  an Order certifying the Nationwide Class and California and Illinois Subclasses, and appointing the Plaintiffs and their Counsel to represent the Class;

B.  equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiffs and Class Members;

C.  injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D.  an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be

**66**

**CLASS ACTION COMPLAINT**

determined;

E.    an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.    prejudgment interest on all amounts awarded and

G.    all such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and other members of the proposed Class, hereby demand a jury trial on all issues so triable.

Dated: February 2, 2026

Respectfully submitted,

/s/_Daniel Srourian
Daniel Srourian, Esq.
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr. Suite 200
Beverly Hills, CA 90210
Telephone: (213) 474-3800
Facsimile: (213) 471-4160
Email: daniel@slfla.com

Tyler J. Bean*
Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: ssingh@sirillp.com

*pro hac vice admission anticipated*

*Attorneys for Plaintiffs and the Class*

**CLASS ACTION COMPLAINT**