UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:26-cv-01030-MWC-AGR Date: June 11, 2026

Title: Nicole Firlej, *et al.* v. Petrosian Esthetic Enterprises, LLC, *et al.*

Present: The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
| --- | --- |
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| --- | --- |
| N/A | N/A |

**Proceedings: (IN CHAMBERS) ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION (DKT. [27]); STAYING THIS ACTION AS TO PLAINTIFF NICOLE FIRLEJ; AND ORDERING THE PARTIES TO FILE A JOINT REPORT AND APPEAR FOR A STATUS CONFERENCE RE: INITIATION OF ARBITRATION**

Before the Court is Defendants Petrosian Esthetic Enterprises, LLC and SEC Laser Aesthetics Chicago, LLC's ("SEV") (collectively, "Defendants") Motion to Compel Arbitration and Stay Proceedings ("motion"). Dkt. # 27 ("*Mot.*"). In support of their motion, Defendants have attached: the Declaration of Carrie Julier, Dkt. # 27-1 ("*Julier Decl.*") and exhibits attached thereto; and the Declaration of James H. Moon, Dkt. # 27-2 ("*Moon Decl.*"), and accompanying exhibit. Plaintiffs Nicole Firlej ("Firlej") and Hania Rouhani ("Rouhani") (collectively, "Plaintiffs") opposed the motion, Dkt. # 31 ("*Opp'n*"), and attached: the Declaration of Alyssa Tolentino, Dkt. # 31-1 ("*Tolentino Decl.*"), with concurrently filed exhibits. Defendants replied. Dkt. # 32 ("*Reply*"). The Court finds this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. After considering the papers, the Court **GRANTS** Defendants' Motion to Compel Arbitration and **STAYS** this action as to Plaintiff Nicole Firlej. The parties are **ORDERED** to file a joint report every 60 days regarding the status of arbitration. Additionally, the Court **SETS** a Status Conference for **Friday, July 17, 2026** regarding the initiation of arbitration. The parties **SHALL** file a Status Report by **no later than Friday, July 10, 2026**.

I. Background & Procedural History

The putative class action Complaint alleges that after Plaintiffs utilized SEV's online website to schedule medical appointments, Defendants then transmitted their "personally identifiable, sensitive health information" to unauthorized third parties via hidden online tracking tools. *See* Dkt. # 1 ("*Compl.*") ¶¶ 4–6, 16–26, 34. The Complaint further alleges that as a result of this transmission, Plaintiffs immediately began seeing targeted online advertisements for cosmetic services and products. *See id.* ¶¶ 20, 26.

A. Completion of Consent Form

On July 21, 2025, Firlej booked an appointment with SEV. *Julier Decl.* ¶ 4. Thereafter, SEV sent Firlej a confirmation message instructing her to complete her pre-appointment forms, made available in a hyperlink to SEV's website. *Id.* On August 3, 2025, Firlej completed those forms, which included the "[IL] Premises Consent Form – Club" ("Consent Form") partly at issue. *Id.*; *see also* Ex. A to *Julier Decl.* ("*Consent Form*") at 5. As relevant here, the Consent Form contains a checkbox at the very bottom of the form, with the following provision immediately adjacent to it:

> I represent that I am 18+ years of age and/or have a parent/legal guardian to represent me. I have read, agree and understood this Premises Consent Form and Terms of Use available to me at the links provided below: [links to TOUs and Consent Form]

*Consent Form* at 7 (internal hyperlinks omitted).

The TOUs, in turn, state at the top of page one:

> IMPORTANT, READ CAREFULLY – DISPUTE RESOLUTION. SECTION 20 OF THESE TERMS CONTAINS A DISPUTE RESOLUTION PROVISION THAT (I) REQUIRES YOU TO RESOLVE DISPUTES BETWEEN YOU AND SEV BY BINDING, INDIVIDUAL ARBITRATION; (II) LIMITS YOUR ABILITY TO SEEK RELIEF IN A COURT OF LAW; (III) WAIVES YOUR RIGHT TO PARTICIPATE IN CLASS ACTIONS, CLASS

> ARBITRATIONS, OR A JURY TRIAL; AND (IV) AND LIMITS THE TIME IN WHICH YOU MAY MAKE A CLAIM.

Ex. B to *Julier Decl.* ("*TOUs*") at 11 (capitalizations in original).

Section 20 of the TOUs contains a "Dispute Resolution" section, which begins with a disclaimer that by agreeing to these terms, "any Dispute" between SEV and the user will be resolved as described in this section. *See id.* at 15 (capitalizations omitted). The TOUs define "a Dispute" as "any dispute, claim or controversy arising out of or relating to your use of or access to our Site, Services, or SEV Content, these Terms or the breach, termination, enforcement, interpretation, or validity of these Terms[.]" *Id.* Section 20 continues, in pertinent part, that if the user is "unable to informally resolve any Dispute with SEV, . . . such Dispute shall be submitted to binding, confidential arbitration . . . in Los Angeles, California, administered by JAMS, and before a single arbitrator pursuant to JAMS's Comprehensive Arbitration Rules and Procedures."[1] *Id.*

On February 2, 2026, Plaintiffs filed their class action Complaint against Defendants, asserting claims for invasion of privacy, negligence, breach of implied contract, unjust enrichment, violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq.*, violations of the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code §§ 360, *et seq.*, and violations of the Illinois Eavesdropping Act, 720 Ill. Comp. Stat. 5/14-1, *et seq.* *See id.* at 46–66. On May 6, 2026, Defendants filed the pending Motion to Compel Arbitration. Dkt. # 27.

## II. Legal Standard

### A. Motion to Compel Arbitration

"The Federal Arbitration Act ('FAA') governs the enforceability of arbitration agreements in contracts involving interstate commerce." *Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 830–31 (9th Cir. 2022) (internal quotation marks and citation omitted). "Under the FAA, private agreements to arbitrate are 'valid, irrevocable, and enforceable,

[1] The TOUs have hyperlinked "JAMS's Comprehensive Arbitration Rules and Procedures" to those rules. *See TOUs* at 11; *Mot.* at 9.

save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Id.* at 831 (quoting 9 U.S.C. § 2). "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the *question of arbitrability*, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Id.* (emphasis in original) (internal quotation marks and citation omitted). Before compelling the parties to arbitration, the Court's task is two-fold: it must determine "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Id.* (internal quotation marks and citation omitted). Both requirements look to state law to determine whether the parties entered into an arbitration agreement, and whether that agreement covers the dispute at issue. *Id.* at 831–32.

The party seeking to compel arbitration "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Godun v. JustAnswer LLC*, 135 F.4th 699, 708 (9th Cir. 2025) (citation omitted). If the parties dispute whether they entered into an arbitration agreement, the Court must rely on the summary judgment standard expounded in Federal Rule of Civil Procedure 56 to resolve that dispute. *Knapke*, 38 F.4th at 831; *see also Hanseng v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) ("The summary judgment standard is appropriate because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate.") (internal quotation marks and citation omitted).

## III. Discussion

Defendants request that the Court compel Plaintiff Firlej to arbitrate her claims because she assented to SEV's Terms of Use ("TOUs"), and the Arbitration Clause contained therein, when she booked her appointment. *See Mot.* at 8–9. Defendants further maintain that Plaintiff delegated gateway issues of arbitrability to the arbitrator. *See id.* at 13–14. Plaintiff disputes the formation, scope, and validity of the Arbitration Clause. Before turning to the existence of an agreement, the Court first addresses Plaintiff's authentication arguments.

### A. Authentication Objection

Defendants attached to their motion the Declaration of Carrie Julier and three accompanying Exhibits: (1) a copy of Firlej's completed "[IL] Premises Consent

Form – Club" ("Consent Form"), attached as Exhibit A; (2) a copy of SEV's TOUs, attached as Exhibit B; and (3) a copy of SEV's Privacy Notice, attached as Exhibit C. *See Julier Decl.* ¶¶ 4–6. Plaintiff objects that Julier failed to authenticate the exhibits by not demonstrating "familiarity with the preparation of the documents," identifying "how the records came into being," nor indicating that Julier "had any regular connection to the records or knowledge of them except that gained by hearsay." *Opp'n* at 9–10 (internal quotation marks and citations omitted).

Plaintiff's objection lacks merit. When ruling on a motion to compel arbitration the Court "will consider the substance of evidence that would be admissible at trial even if the form of the evidence is improper so long as that same evidence may be admissible in another form." *Hartranft v. Encore Cap. Grp., Inc.*, 543 F. Supp. 3d 893, 914–15 (S.D. Cal. 2021) (citation omitted); *see also Dinkins v. Schinzel*, 362 F. Supp. 3d 916, 922–23 (D. Nev. 2019) (declining to "disregard all exhibits for lack of proper authentication because their substance could be admissible at trial").[2] Even if the Court entertained the objection, "[Federal Rule of Evidence] 901 does not require personal knowledge of a document's creation, but rather only personal knowledge that a document was part of an official file." *United States v. Estrada-Eliverio*, 583 F.3d 669, 673 (9th Cir. 2009) (citation omitted); *see also Trujillo v. Motts LP*, No. CV 22-5103 JGB (KKx), 2023 WL 6194054, at *2 (C.D. Cal. Jan. 4, 2023) ("It is well-established that an individual need not be present when a business record was prepared to testify to its authenticity and validity.") (collecting case law).

As the Chief Executive Officer of Petrosian Esthetic Enterprise, Julier declares she is "familiar with the forms and agreements completed by customers prior to obtaining" Defendants' services, and is also familiar with the SEV website customer interface. *See Julier Decl.* ¶¶ 1–2. Julier affirms that she has reviewed Firlej's records, including her "booking history with SEV" and the "agreements she completed prior to her obtaining her services from SEV[.]" *Id.* "Ninth Circuit courts routinely find the authentication

---

[2] Many of Plaintiffs' citations are to cases assessing an earlier version of Federal Rule of Civil Procedure 56. The 2010 amendments to the Rule, however, eliminated the requirement that evidence must be authenticated and admissible to be considered. *See Dinkins*, 362 F. Supp. 3d at 923. Rule 56, in its present form, requires only that the "substance of the proffered evidence would be admissible at trial." *Id.* (emphasis omitted); *cf. Romero v. Nev. Dep't of Corrs.*, 673 F. App'x 641, 644 (9th Cir. 2016); Fed. R. Civ. P. 56(c)(4).

requirement met under similar circumstances." *Meza v. Gen. Motors Fin. Co.*, No. EDCV 19-449 JGB (KKx), 2019 WL 12374012, at *2 (C.D. Cal. Aug. 2, 2019) (Vice President of company had properly authenticated documents after testifying he was "personally familiar with the systems of records maintained by GM" and had "reviewed GM's electronic systems of record pertaining to Plaintiffs' Lease accounts") (cleaned up) (collecting case law). Plaintiff's objection is **OVERRULED**.

B. Delegation of Arbitrability

At the outset, Defendants assert that Plaintiff "agreed not only to arbitrate this dispute, but also to delegate gateway questions—such as enforceability or scope of the TOUs or the Arbitration Agreement—to the Arbitrator in the first instance[.]" *Mot.* at 13.

A purported arbitration agreement presents a few "gateway" issues: First, whether an agreement to arbitrate was actually formed. *See Ahlstrom v. DHI Mortg. Co.*, 21 F.4th 631, 634–35 (9th Cir. 2021). Second, whether that agreement is "valid," *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023), in other words, whether there are any defenses. Third, "whether the agreement encompasses the dispute at issue." *Id.* Normally, the Court resolves these issues, but parties may also enter into a separate agreement to arbitrate some of these "gateway" questions—*i.e.*, through a "delegation" provision. *See, e.g.*, *Sandler v. Modernizing Med., Inc.*, 170 F.4th 1209, 1212 (9th Cir. 2026). Enforcement of a delegation provision "depends on whether there is 'clear and unmistakable' evidence that the parties agreed to delegate the validity question to the arbitrator." *Id.* (citation omitted). While "some 'gateway' issues pertaining to an arbitration agreement, such as issues of validity and arbitrability, can be delegated to an arbitrator by agreement . . . parties cannot delegate issues of formation to the arbitrator." *Ahlstrom*, 21 F.4th at 634–35 (citation omitted).

Accordingly, "when presented with a contract that includes both an arbitration provision and a delegation provision, a reviewing court can consider three types of challenges: (1) formation challenges to the delegation provision . . . (2) validity and enforceability challenges to the delegation provision, . . . and (3) formation challenges to the underlying arbitration provision[.]" *Joseph v. Amazon.com Inc.*, No. 23-cv-05176-PCP, 2024 WL 3012499, at *3 (N.D. Cal. June 14, 2024) (internal citations omitted). "But if the delegation provision is valid, the court cannot consider validity or enforceability

challenges to the underlying arbitration provision." *Id.* (citing *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022)).

Plaintiffs dispute the formation of the arbitration clause, asserting that the TOUs failed to properly place Firlej on notice of its terms. The Court assesses only Plaintiffs' "formation challenges to the underlying arbitration provision," and incorporated delegation provision. *See Joseph*, 2024 WL 3012499, at *3.

*i. Defective Notice*[3]

"In California, internet contracts are classified 'by the way in which the user purportedly gives their assent to be bound by the associated terms: browsewraps, clickwraps, scrollwraps, and sign-in wraps.'" *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1014 (9th Cir. 2024) (quoting *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021)). On one end of the spectrum is a clickwrap agreement: one that "requires users to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Id.* (citation omitted); *see also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (a clickwrap agreement "presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed."). Courts "routinely" find clickwrap agreements are enforceable. *Keebaugh*, 100 F.4th at 1014; *Oberstein*, 60 F.4th at 513.

On the other end of the spectrum are browsewrap agreements, where "a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Oberstein*, 60 F.4th at 513. Browsewrap agreements are less likely to be found enforceable because the user is usually "unaware that contractual terms were even offered," let alone accepted. *See id.* (citation omitted). However, if an online agreement falls somewhere between clickwrap and browsewrap, then the Court "must analyze mutual assent under an objective-reasonableness standard," *id.*, and ask (1) whether the website provided "reasonably conspicuous notice of the terms to which the consumer will be bound"; and

[33] "Because contract formation is a question of state law," the Court must first "look to the appropriate state law." *Godun*, 135 F.4th at 708. As the parties agree that California law applies to this matter, the Court will assess the instant motion according to California law. *See Mot.* at 12 n.2; *Opp'n* at 14.

(2) whether the consumer took "some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (citation omitted).

The Consent Form at issue here falls somewhere between clickwrap and browsewrap—the form does not present the user with the TOUs on a pop-up screen, but it also does not assume assent to terms merely through the user's continued use of the website. Accordingly, the Court must ask whether the Consent Form provided "reasonably conspicuous notice" of the terms and whether Firlej took action to manifest her assent. *See id.*

a. Reasonably Conspicuous Notice

"To satisfy the first part of the test, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Oberstein*, 60 F.4th at 515 (quotation marks and citations omitted). This inquiry is "fact-intensive and is informed by the totality of the circumstances." *Godun*, 135 F.4th at 709 (quotation marks and citation omitted). Relevant factors include the "visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast (against the page's background)." *Id.* The Court reviews the "conspicuousness and placement of the 'Terms of Use'" link, "other notices given to users of the terms of use, and the website's general design[.]" *Oberstein*, 60 F.4th at 515. Additionally, where a transaction "contemplates entering into a continuing, forward-looking relationship that would be governed by terms and conditions," such as through the registration of an account, *Keebaugh*, 100 F.4th at 1016, then the user is "on notice for a link to the terms of that continuing relationship." *Oberstein*, 60 F.4th at 517.

Turning to the Consent Form, the totality of the circumstances demonstrates that the form provides reasonably conspicuous notice of the TOUs. For instance, there is no contrasted or colored background, the font remains the same size, color, and typeface throughout the form, and the paragraphs and sentences are all clearly spaced. *See Consent Form* at 5–7; *contra Godun*, 135 F.4th at 711 ("[T]he color of the advisal text blends into the background and is displayed in a lighter color than other text on the page."); *cf. Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 928 (N.D. Cal. 2024) ("[T]he hyperlink appears on a screen that is simple and lacks clutter—making the hyperlink more readily

apparent."). The entire form is only three pages, not all of which is filled with text. *Cf. Ghazizadeh*, 737 F. Supp. 3d at 928–29; *Consent Form* at 5–7. Not only does the form provide the URL Links to the TOUs—as opposed to mere hyperlinks—but the links are distinguished from the preceding text by use of black bullet points. And the terms are clear: they begin by stating "I have read, agree and understood this Premises Consent Form and Terms of Use available to me at the links provided below: . . ." *Consent Form* at 7.

These visual aspects all weigh in favor of finding that the Consent Form provides reasonably conspicuous notice of the TOUs. *See Keebaugh*, 100 F.4th at 1021 (visual requirements satisfied where notice was "conspicuously displayed directly below the action button" the "statement clearly denotes that continued use will constitute acceptance of the Terms of Service," and the "link to the Terms of Service is conspicuously distinguished from the surrounding text"); *Oberstein*, 60 F.4th at 516 (notice was "conspicuously displayed directly above or below the action button," the language "clearly denotes that continued use will act as a manifestation of the user's intent to be bound," and the "Terms of Use" hyperlink was "distinguished from the surrounding text"). While the Consent Form "could have used underlining, blue coloring, all capital letters, or a larger font" to make reference to the TOUs stand out more, "those features are not dispositive, and courts have enforced arbitration agreements where hyperlinks were conspicuous even without blue font or capitalization." *Ghazizadeh*, 737 F. Supp. 3d at 928 (citation omitted).

Finally, turning to context, Plaintiff objects that "there is nothing in the Premises Consent Form that alerts SEV's patients that it relates to anything other than the patient's use of SEV's premises to receive medical care." *Opp'n* at 13–14. Upon a thorough review of the Consent Form, it both requests consent from prospective patients and serves to disclaim several forms of liability for new patients, covering a myriad of topics. *See generally Consent Form*. For instance, the first page of the Consent Form contains several disclaimers that patients "give up [their] right to bring a court action to recover . . . for any personal injury or property damage" arising out of their utilization of SEV's services. *See id.* at 1. Then, the form disclaims several forms of liability should a patient contract COVID-19 while receiving care at SEV. *See id.* The second page requests the patient's general consent to receiving medical services and then disclaims that SEV may update their medical consent forms and policies "at any time," providing the patient with a right to review such updated forms prior to signing. *Id.* at 2. Finally, the last page contains several agreements and disclaimers, including: requesting patients consent to SEV's ability to surveil and record the premises; notifying the patient that SEV is not responsible for

missing or lost property; requiring patients to supervise their children or pets that accompany them to appointments; and requiring the patient's consent to being contacted by phone calls and text messages. *Id.* at 3.

Taken together, the Consent Form covers various topics, all of which contemplate the formation of a long-term relationship between a new, prospective patient and SEV and its services. As such, this context makes it reasonable to expect that Firlej was "entering into a continuing, forward-looking relationship governed by terms and conditions." *Keebaugh*, 100 F.4th at 1017 (internal quotation marks and citation omitted). Such a relationship "would have put [Firlej] on notice for a link to the terms of that continuing relationship." *Oberstein*, 60 F.4th at 517; *see, e.g.*, *L.B. v. LinkedIn Corp.*, No. 5:24-cv-06832-EJD, 2025 WL 2899514, at *9 n.7 (N.D. Cal. Oct. 10, 2025) ("[B]y entering information to book a consult through Spring Fertility's website, it would be reasonable to assume that users contemplate a forward-looking relationship involving continued medical care."); *Ramirez v. Trusper, Inc.*, No. 5:24-cv-02012-EJD, 2024 WL 4479862, at *4 (N.D. Cal. Oct. 11, 2024) ("[T]he context of Ramirez's visit to Musley's website to seek telehealth services and ongoing prescription skincare treatment contemplates an ongoing relationship . . . whereby a reasonable user would expect the relationship to be bound by terms and conditions.") (citations omitted).

As such, because the visual aspects of the notice are clear and because the context of the transaction contemplates a long-term doctor-patient relationship, the Consent Form provides reasonably conspicuous notice of the TOUs (and the Arbitration Clause contained therein).

b. Unambiguous Manifestation of Assent

The second element is also easily met. *Oberstein*, 60 F.4th at 517. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857 (citation omitted). The last page of the Consent Form, directly underneath the patients' "full legal name," provides: "By checking this box I am agreeing to the following terms: . . ." *Consent Form* at 7. This explanation therefore informed Firlej of "the legal significance" of her actions. *See Berman*, 30 F.4th at 857. It is undisputed that Firlej checked the dialog box immediately next to the terms that she has "read, agree and understood this Premises Consent Form and Terms of Use available to me

. . .” *Consent Form* at 7. The Court is therefore satisfied that both elements of mutual assent are met and that the parties formed an agreement to arbitrate.

C. Defenses & Scope of Agreement

Plaintiffs have raised several defenses to the validity and enforcement of the Arbitration Clause, namely, that the clause is both procedurally and substantively unconscionable. *See Opp'n* at 20—26. Plaintiffs also challenge that the Arbitration Clause does not cover the scope of the claims pressed in this action. *See id.* at 16–20. However, Defendants are correct that by incorporating the JAMS Rules, the TOUs have delegated all such defenses to the arbitrator. *See Mot.* at 13–14.

The Arbitration Clause states that all "Disputes shall be resolved by binding arbitration . . . administered by JAMS, and before a single arbitrator pursuant to JAMS's Comprehensive Arbitration Rules and Procedures." *TOUs* at 15. The TOUs have hyperlinked the JAMS Rules as well. "Courts have found that parties clearly delegated arbitrability where they incorporated an arbitrator's arbitration rules in the agreement." *Patrick*, 93 F.4th at 480. "Incorporation of the JAMS arbitration rules by reference constitutes clear and unmistakable evidence that the parties agree to arbitrate arbitrability." *Id.* at 481; *see also Sandler*, 170 F.4th at 1212 ("The agreement incorporates the JAMS rules, which delegate the question of the agreement's validity to the arbitrator. That incorporation, we have held, evinces a clear and unmistakable intent to delegate.") (citation omitted); *see, e.g.*, *Montes v. Thorntons LLC*, No. 25-cv-05895-EKL, 2026 WL 881712, at *5 (N.D. Cal. Mar. 26, 2026) (declining to weigh in on plaintiff's arguments "that the Arbitration Agreement is unconscionable and unenforceable" because such issues had been delegated to the arbitrator via incorporation by reference); *Joseph*, 2024 WL 3012499, at *4 (declining to assess plaintiff's arguments "going to the merits of the underlying dispute and challenges [to] the scope of the Agreement" because the arbitration agreement contained a "clear and unmistakable delegation clause"). Because the Court is satisfied that the parties formed an agreement, the Court **GRANTS** Defendants' Motion to Compel Arbitration. All defenses to the validity and enforceability of the TOUs have been delegated to the arbitrator.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:26-cv-01030-MWC-AGR Date: June 11, 2026

Title: Nicole Firlej, *et al.* v. Petrosian Esthetic Enterprises, LLC, *et al.*

D. Stay of this Case

"Under 9 U.S.C. § 3, a district court must stay proceedings for claims and issues 'referable to arbitration' pending resolution of the arbitration." *Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 832 (9th Cir. 2019). Here, all of Plaintiff Firlej's claims are referable. The Court **STAYS** this case as to Plaintiff Firlej alone, pending resolution of the arbitration proceedings.

IV. Conclusion

For the foregoing reasons, the Court **ORDERS** as follows:

1. Defendants' Motion to Compel Arbitration (Dkt. # 27) is **GRANTED**. The June 12, 2026 hearing is **VACATED**.

2. This action is **STAYED** as to Plaintiff Nicole Firlej.

3. The parties **SHALL** file a joint update every 60 days beginning from the date of this Order regarding the status of arbitration. The parties **SHALL** immediately notify the Court upon completion of arbitration.

4. The Court **SETS** a Status Conference Re: The Initiation of Arbitration for **Friday, July 17, 2026** at 1:30 p.m. in Courtroom 6A. The parties **SHALL** file a Status Report by **Friday, July 10, 2026**.

**IT IS SO ORDERED.**

:

**Initials of Preparer** TJ