Alyssa Tolentino (*pro hac vice*)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (212) 532-1091
E: *atolentino@sirillp.com*

Sonjay C. Singh (*pro hac vice*)
**SIRI & GLIMSTAD LLP**
400 East Pratt Street, 8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: *ssingh@sirillp.com*

Daniel Srourian, Esq. SBN 285678
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr. Suite 200
Beverly Hills, CA 90210
Tel: (213) 474-3800
Fax: (213) 471-4160
E: *daniel@slfla.com*

*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**NICOLE FIRLEJ** and **HANIA ROUHANI**, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

**PETROSIAN ESTHETIC ENTERPRISES, LLC,** and **SEV LASER AESTHETICS CHICAGO, LLC**,

Defendants.

Case No. 2:26-cv-01030-MWC-AGR

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Assigned to the Hon. Michelle Williams Court, Courtroom 6A

Date: September 4, 2026
Time: 1:30 p.m.

Action Filed: February 2, 2026
FAC Filed: July 9, 2026

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ..... 1

II. LEGAL STANDARD ..... 1

III. ARGUMENT ..... 2

A. PLAINTIFF'S CIPA CLAIM IS Properly PLED ..... 2

i. The Tracking Tools Contemporaneously Transmit Website Users' Communications to Google in Real-Time. ..... 2

ii. Plaintiff adequately alleges that Google "read" the contents of her communications. ..... 3

iii. Plaintiff adequately alleges that the contents of her communications were read "in transit" ..... 5

B. PLAINTIFF HAS STATED A CLAIM FOR BREACH OF IMPLIED CONTRACT. ..... 8

ii. Plaintiff has alleged consideration. ..... 11

iii. Plaintiff Alleges Benefit-of-the-Bargain Damages. ..... 13

IV. CONCLUSION ..... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130 (C.D. Cal. 2021) .... 12

*Archambault v. Riverside Resort & Casino, Inc.*, 2025 U.S. Dist. LEXIS 176564 (D. Nev. 2025) .... 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .... 2

*In re BetterHelp, Inc. Data Disclosure Cases*, 2024 U.S. Dist. LEXIS 187442 (N.D. Cal. 2024) .... 10

*Briskin v. Shopify Inc.*, 2026 U.S. Dist. LEXIS 170011 (N.D. Cal. 2026) .... 8

*C.M. v. MarinHealth Med. Grp., Inc.*, 2024 U.S. Dist. LEXIS 10189 (N.D. Cal. 2024) .... 10, 12

*Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336 (9th Cir. 1996) .... 2

*Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016 (C.D. Cal. 2025) .... 5

*Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109 (N.D. Cal. 2025) .... 8

*Doe v. Kaiser Found. Health Plan, Inc.*, 2024 U.S. Dist. LEXIS 66733 (N.D. Cal. 2024) .... 9, 10

*Doe v. Regents of the Univ. of Cal.*, 672 F. Supp. 3d 813 (N.D. Cal. 2023) .... 9

*In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) .... 7

*Goldstein v. Rumble Inc.*, 2026 U.S. Dist. LEXIS 113489 (C.D. Cal. 2026) .... 8

*Gray v. Luxottica of Am., Inc.*,
2024 U.S. Dist. LEXIS 243633 (C.D. Cal. 2024) .......... 2

*Gutierrez v. Converse Inc.*,
2024 WL 3511648 (C.D. Cal. 2024) .......... 8

*Hameed-Bolden v. Forever 21 Retail, Inc.*,
2018 U.S. Dist. LEXIS 217868 (C.D. Cal. 2018) .......... 10

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) .......... 5

*Irwin v. Jimmy John's Franchise, LLC*,
175 F. Supp. 3d 1064 (C.D. Ill. 2016) .......... 11

*Kirsten v. Cal. Pizza Kitchen, Inc.*,
2022 U.S. Dist. LEXIS 206552 (C.D. Cal. 2022) .......... 12

*Knappenberger v. City of Phoenix*,
566 F.3d 936 (9th Cir. 2009) .......... 2

*Krzyzek v. OpenX Techs., Inc.*,
817 F. Supp. 3d 857 (N.D. Cal. 2026) .......... 7

*Licea v. Cinmar, LLC*,
659 F. Supp. 3d 1096 (C.D. Cal. 2023) .......... 5

*In re Marriott Int'l, Inc.*,
440 F. Supp. 3d 447 (D. Md. 2020) .......... 13

*Medoff v. Minka Lighting, LLC*,
2023 U.S. Dist. LEXIS 81398 (C.D. Cal.2023) .......... 10, 11

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
779 F.3d 1036 (9th Cir. 2015) .......... 9

*Plaintiffs v. MGM Resorts Int'l*,
638 F. Supp. 3d 1175 (D. Nev. 2022) .......... 12, 13

*Plaintiffs v. Walt Disney Co.*,
2022 U.S. Dist. LEXIS 212169 (C.D. Cal., 2022) .......... 11

*R.C. v. Sussex Publrs., LLC*,
2025 U.S. Dist. LEXIS 118979 (N.D. Cal. 2025) .......... 7

*Riganian v. LiveRamp Holdings, Inc.*,
791 F. Supp. 3d 1075 (N.D. Cal. 2025)........................................................5, 7, 8

*Torres v. Prudential Fin., Inc.*,
2025 WL 1135088 (N.D. Cal. 2025)....................................................................8

*In re: Yahoo! Inc. Customer Data Sec. Breach Litig.*,
313 F. Supp. 3d 1113 (N.D. Cal. 2018)............................................................14

*In re Zoom Video Communs. Privacy Litig.*,
525 F. Supp. 3d 1017 (N.D. Cal. 2021)............................................................12

## I. PRELIMINARY STATEMENT

Plaintiff adequately alleges that Defendants Petrosian Esthetic Enterprises, LLC and SEV Laser Aesthetics Chicago, LLC (together, "Defendants" or "SEV") captured her personal health information without her knowledge or consent. *See* Order Granting and Part and Denying in Part Defendant's Motion to Dismiss, ECF No. 37 (the "Order"). In addition, Plaintiff adequately alleges a violation of the ECPA (Count V), an invasion of her privacy (Count I), negligence (Count II), and unjust enrichment (Count IV). *Id*.

However, the Court identified certain deficiencies in Plaintiff's pleading of her CIPA claim and her breach of implied contract claim. *Id*. at 6-9, 13-14. As to Plaintiff's CIPA claim, the Court found that Plaintiff failed to allege a reading in-transit. *Id*. at 8-9. Plaintiff submitted an Amended Complaint to explain in greater detail that Google's Tracking Tools[1] are both effective and profitable ***because*** they are able to analyze internet communications while they are in transit. *See* ECF No. 40 (hereinafter the "FAC"). As to Plaintiff's implied contract claim, the Court found that Plaintiff had not alleged consideration, the terms of the implied contract, or damages. Order at 13-14. Accordingly, Plaintiff's FAC identifies the relevant terms of the contract, the source of those terms, and the source of her benefit of the bargain damages.

The FAC cures the deficiencies identified in the Order. Defendants, however, ask that the Court require even more of Plaintiff. *See generally* Defendants' Motion to Dismiss First Amended Complaint, ECF No. 45 (hereinafter the "Motion" or "Mot.") (arguing Plaintiff still fails to state claims for CIPA and breach of implied contract). For the reasons set forth below, Defendants' Motion should be denied.

## II. LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the burden of proof is on the movant, and

[1] Unless otherwise defined, capitalized terms shall have the same meaning as the terms defined in Plaintiff's FAC.

the court draws all reasonable inferences in plaintiff's favor, assuming all well pleaded factual allegations to be true and determining whether they plausibly give rise to an entitlement to relief. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir. 1996). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts are instructed to freely grant leave to amend unless the defects identified could not possibly be cured. *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009).

## III. ARGUMENT

### A. PLAINTIFF'S CIPA CLAIM IS PROPERLY PLED

To establish a CIPA claim, a plaintiff must allege that the defendant "read or learned the contents of a communication while the communication was in transit, or in the process of being sent or received." *Gray v. Luxottica of Am., Inc.*, 2024 U.S. Dist. LEXIS 243633, at *19 (C.D. Cal. Dec. 16, 2024) (collecting cases). Here, the Court already found in its previous Order that Plaintiff successfully pled two of those elements, specifically that the "contents" of her communications with Defendants were intercepted while they were "in transit." The only outstanding issue concerned whether Google "read the contents" of Plaintiff's communications. Order at 7-8. Plaintiff's FAC added allegations explaining in detail how Google analyzed—and thus read—Plaintiff's communications in real-time and how that advertising behemoth monetized those communications through selling ads. These allegations resolve the issues the Court previously identified with the "read in transit" elements and thus, Plaintiff's CIPA claim should proceed.

#### i. The Tracking Tools Contemporaneously Transmit Website Users' Communications to Google in Real-Time.

In the FAC, Plaintiff provides a detailed explanation of how Google's Tracking Tools function. Communications between an Internet user's web browser and a website "consist of Requests and Responses." FAC ¶ 53. "A web browser's Request

essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website." *Id*. When a website installs Google's Tracking Tools, the website administrator puts code on each web page that tells the web browser to contemporaneously transmit information to Google when the user takes certain actions, such as clicking a button or filling out a form. *Id*. ¶¶ 56-59, 67. For example, Figure 2 in the FAC shows the information transmitted by a "click event" that triggers when a user selects a medical procedure on the SEV Website. *Id*. ¶ 66. Because SEV chose to configure this click event, when a user clicks a button to select a medical procedure, two communications happen simultaneously but the user is only aware of the first: (1) the user's selection is sent to the Website server, which responds by displaying the next screen in the appointment scheduling process; and (2) the browser sends to Google information related to the user's device, Google account and selections on the appointment scheduling form. *See id*. ¶¶ 56-58; 63-70. If the user has a Google account, the Tracking Tool transmission includes a specific cookie identifier that identifies the user via her Google account. *Id*. ¶¶ 55-59. With regards to non-accountholders, Google can generally still identify the user by analyzing the user's "browser fingerprint"—the often unique combination of a user's device and browser, such as screen resolution, time zone setting, browser software type and version, language setting, and IP address. *Id*. ¶¶ 60-62. As a result, Google can link every piece of information collected about a user from any website on which its Tracking Tools are present, automatically compiling vast amounts of personal information into a singular profile for the purpose of selling hyper-targeted advertising. *Id*. ¶¶ 37-39.

**ii. Plaintiff adequately alleges that Google "read" the contents of her communications.**

Plaintiff alleges in detail that Google read the contents of her communications,

just as it reads the contents of every communication transmitted through the Tracking Tools. As the FAC explains, Google uses the information collected through the Tracking Tools to optimize its personalized advertising. For example, "[i]f Google receives information that a person is concerned about a potential health-related issue (e.g., dermatological care), it will collect that information and allow its clients to use that information to stream ads related to health care products and services to that person's computers and smartphones." *Id.* ¶ 7. Plaintiff experienced this firsthand when, after using the Website, she "immediately began seeing targeted online advertisements for cosmetic services and products." *Id.* ¶ 27. As a result of the massive amount of user data available to it, Google is able to offer ad targeting based on almost any criteria, including an individual's "location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more." *Id.* ¶ 39.

Plaintiff specifically alleges this as Google's *modus operandi*: to collect and analyze user communications through the Tracking Tools and use the information within for ad targeting. *See id.* ¶¶ 24, 70, 90, 205. Google is so hungry for access to this information that it even provides its Business Tools for free—and, as the FAC explains, businesses like SEV happily accept the deal, trading their customers' privacy for enhanced marketing through installation of the Tracking Tools. *See id.* ¶¶ 43-45. The Court need not look further than Google's own statements to verify the truth of these allegations. Google readily admits that it parses the information collected from third-party websites for its targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google." *Id.* ¶ 37. Or, as Google's former CEO puts it: "We know where you are. We know where you've been. We can know what you're thinking about." *Id.* at ¶ 42.

In sum, Plaintiff outlines a targeted advertising operation that could only exist through use of the voluminous user information collected through the Tracking Tools, explains the specific technology Google uses to parse and gather that user information, and even provides statements from Google itself wherein it admits that it reads the contents of Tracking Tool transmissions and uses them for targeted advertising. This is more than enough to allege that Google read the contents of Plaintiff's communications that were disclosed through the Tracking Tools at this stage.

Because Plaintiff sets forth "a specific factual theory as to how [the interceptor] incorporates—and thus reads—the intercepted content…'" Plaintiff plausibly alleges that Defendants enabled Google to read or attempt to read the contents of her communications. *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1092 (N.D. Cal. 2025); *see also Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1032 (C.D. Cal. 2025) (same where plaintiff alleged that cookies on the defendant's website "enable[e] [third parties] to surreptitiously track in real time and collect Website users' personal information…."); *Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 863 (C.D. Cal. 2024) (same where plaintiffs alleged that users' communications were intercepted and redirected to be utilized by the interceptors).

**iii. Plaintiff adequately alleges that the contents of her communications were read "in transit"**

As Defendants note, CIPA "differentiates between what [a] third party does during [a] conversation vs. after." *Licea v. Cinmar, LLC*, 659 F. Supp. 3d 1096, 1108 (C.D. Cal. 2023); Mot. at 7:18-20. But contrary to Defendants' argument, Plaintiff's CIPA claim arises from what occurred "***during***" her communications with the Website, not after. FAC ¶ 205. As detailed in the FAC, the Tracking Tools installed on the Website do not merely intercept and store information but rather actively analyze that information in real-time to correlate it to the user's identity. When the Tracking Tools transmit a user's communication to a website, they "[s]imultaneously…request identifying information from any Google cookies

previously installed on the user's web browser[,]…combine the data received from the browser with the data acquired from the cookie, and instruct[] the web browser to transmit the information back to Google." *Id.* ¶¶ 57-58. This is precisely what Plaintiff must allege at this juncture: that something more was done "than just intercept[ing] the communication while it is in transit." ECF No. 37 [Court's Order on Defendants' Motion to Dismiss the original Complaint], at 8.

The network traffic figures included in the FAC show this clearly. *See* Compl. ¶ 66 (figs. 1-4). As the FAC notes, Google uses the "sid" or "Session ID" cookie to correlate user information. *Id.* ¶ 68. The Session ID cookie is used by Google to identify not just a specific user but rather a specific visit made by a specific user to a specific website for a specific purpose (referred to by Google as a "session").[2] For example, Figures 3-4 of the FAC were captured in the same session and show matching Session ID values as a result. *Id.* ¶ 66; *see also id.* ¶ 68 ("identifier cookies are transmitted contemporaneously"); *id.* ¶ 49 (user information "transmitted in real-time as the user navigates a website"). Use of a persistent identifier like the Session ID would simply not be possible if Google did not read Tracking Tool transmissions in real time. To maintain a consistent Session ID, Google must at the least analyze the Tracking Tool transmissions at the time they are sent to ascertain whether they originate from the same device during a single visit to the website. In other words, Google's correlation of data to individual users requires the company to read the Tracking Tool transmissions and draw inferences from their contents in real time. Indeed, other courts have found the same when examining the same Tracking Tools alleged by Plaintiff, even after intense scrutiny of the "reading in transit" requirement.

[2] *See* FAC ¶ 36, n. 8 (incorporating Google Terms page, which explains: "Cookies and similar technologies used for functionality purposes allow [users] to access features that are fundamental to a service. These cookies are used in order to deliver and maintain Google services. Things considered fundamental to a service include remembering choices and preferences, like your choice of language; storing information relating to your session, such as the content of a shopping cart; enabling features or performing tasks requested by you; and product optimizations that help maintain and improve that service.").

*See R.C. v. Sussex Publrs., LLC*, 2025 U.S. Dist. LEXIS 118979, at *5 (N.D. Cal. June 23, 2025) (noting that "Google 'markets the real-time reporting capabilities of Google Analytics and boasts that 'Realtime reports' allow website hosts to 'monitor activity on your website as it happens'" and concluding that identical network traffic exhibits to those in the FAC showing real-time disclosure of specific website actions established reading in transit). Likewise, the Ninth Circuit has explicitly held that the "simultaneous, unknown duplication and communication of GET requests" by Tracking Tools, like Plaintiff alleges here, "do not exempt a defendant from liability under the party exception." *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020); *see also Krzyzek v. OpenX Techs., Inc.*, 817 F. Supp. 3d 857, 868 (N.D. Cal. 2026) (similar allegations that pixel intercepted data "in transit" and "within seconds" of a user's "browsing activities" sufficient to establish the "read in transit" element); *Riganian*, 791 F. Supp. 3d at 1092 (plaintiffs plausibly alleged interception took place "before the communications are received" and "completely loaded" by the intended recipient).

Defendants' arguments to the contrary are unavailing.

***First***, Defendants seize on the FAC's allegations that Google "compiles" user data "across the internet" as purported evidence that reading occurs solely on Google's servers after the conversation. Mot. at 7:21-24. This argument conflates two distinct acts: (1) the initial reading of a user's communication as it occurs in transit on each website; and (2) the subsequent aggregation of data already read from multiple websites into a unified profile, identified by the user's Google cookie identifier. That Google also aggregates data across websites does not mean the initial reading did not occur during transit. When a Tracking Tool transmission is sent, Google automatically analyzes its contents and attaches the appropriate cookie identifiers in real-time. The fact that Google later compiles this data with data from other sources is irrelevant to whether the initial interception and reading was contemporaneous.

***Second***, Defendants cannot claim that Plaintiff's allegations are unsupported by

facts. As explained above, Plaintiff goes far beyond the pleading standard by providing a specific explanation of the subject technology replete with network traffic figures captured from the Website itself. Nor can Defendants ask more of Plaintiff than what courts require at this stage. The authorities upon which Defendants rely were "decided on summary judgment, with the benefit of a full evidentiary record that showed the technical functioning of the defendant's data collection process." *Briskin v. Shopify Inc.*, 2026 U.S. Dist. LEXIS 170011, at *14 (N.D. Cal. July 30, 2026) (discussing *Doe v. Eating Recovery Ctr. LLC*, 806 F. Supp. 3d 1109 (N.D. Cal. 2025) (MSJ decision); *see also Torres v. Prudential Fin., Inc.*, 2025 WL 1135088, at *1 (N.D. Cal. Apr. 17, 2025) (same); *Gutierrez v. Converse Inc.*, 2024 WL 3511648, at *1 (C.D. Cal. July 12, 2024) (same). "As *Torres* itself illustrates…whether communications are 'read' in transit or only after storage is a fact-intensive question that depends on how the challenged technology and processes actually work—a question *Torres* decided only after a full evidentiary record at summary judgment." *Riganian*, 791 F. Supp. 3d at 1092. Requiring more of Plaintiff at this stage "'would require [Plaintiff] to engage in a one-sided guessing game because the relevant information about data capture typically resides uniquely in the custody and control of [Defendants] and its third-party recorder.'" *Goldstein v. Rumble Inc.*, 2026 U.S. Dist. LEXIS 113489, at *14-15 (C.D. Cal. Apr. 24, 2026) (quoting *Esparza v. UAG Escondido A1 Inc.*, 2024 U.S. Dist. LEXIS 24429, at *9 (S.D. Cal. Feb. 12, 2024)).

"[A]t this stage, taking [P]laintiff's allegations as true," as the Court must, Plaintiff plausibly alleges that Defendants allowed Google to read or attempt to read the contents of Plaintiff's communications. *Briskin*, 2026 U.S. Dist. LEXIS 170011, at *14. Defendant's motion to dismiss Plaintiff's CIPA claim should therefore be denied.

### B. PLAINTIFF HAS STATED A CLAIM FOR BREACH OF IMPLIED CONTRACT.

"[I]n California, a cause of action for breach of implied contract has the same

elements as does a cause of action for breach of contract, except that the promise is not expressed in words but is implied from the promisor's conduct." *Doe v. Kaiser Found. Health Plan, Inc.*, 2024 U.S. Dist. LEXIS 66733, at *59 (N.D. Cal. Apr. 11, 2024) (quotations omitted). An implied "contract requires proof of the same elements necessary to evidence an express contract: mutual assent or offer and acceptance, consideration, legal capacity and a lawful subject matter." *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 779 F.3d 1036, 1050-51 (9th Cir. 2015) (quoting 1 Richard A. Lord, *Williston on Contracts* § 1:5 at 37-38 (4th ed. 2007)).

**i. Plaintiff alleges mutual assent.**

"An implied contract requires that both parties agree to its terms and have a 'meeting of the minds,' but the creation of an implied contract can be manifested by conduct rather than words." *Doe v. Regents of the Univ. of Cal.*, 672 F. Supp. 3d 813, 821 (N.D. Cal. 2023) (finding it "plausible that the parties entered into an implied contract by their actions" where plaintiff alleged that she paid money and provided her data to defendant in exchange for services, and she would not have entrusted defendant with her data in the absence of an implied contract obligating it to safeguard that data).

Here, Plaintiff alleges that by paying for services and providing her Sensitive Health Information to SEV, an implied contract between Plaintiff and SEV was formed whereby SEV agreed that it "would not share" Plaintiff's information "with third parties for a commercial purpose[] unrelated to providing them with health care." FAC ¶¶ 105, 156-57. Plaintiff further alleges that she "spent approximately $1,200 for SEV's laser hair removal services" and that there exists a very real and robust market for sensitive data. FAC ¶¶ 23, 80-86. Plaintiff alleges that she would not have entrusted Defendants with her Sensitive Health Information in the absence of an implied agreement requiring Defendants to protect such information from unauthorized disclosure. *Id.* ¶ 158. Finally, Plaintiff alleges that SEV breached their implied contract when SEV disclosed her Sensitive Health Information to third parties without consent, despite its agreement not to do so. *Id.* ¶ 159.

"Courts applying California law have held that similar allegations are sufficient at the motion to dismiss stage to plead an implied contract claim." *Medoff v. Minka Lighting, LLC*, 2023 U.S. Dist. LEXIS 81398, at *25 (C.D. Cal. May 8, 2023) (denying dismissal of implied contract claim where plaintiff alleged he provided his personal information to defendant in exchange for employment and entered into an implied agreement requiring defendant to provide prompt, adequate notice of any unauthorized access to his data).[3] In *Castillo v. Seagate Tech., LLC*, for example, the plaintiffs were former employees of Seagate who "provided their personal information for tax purposes and to receive employment and benefits, with the understanding that Seagate, while it held the information, would take adequate measures to protect it." 2016 U.S. Dist. LEXIS 187428, at *29 (N.D. Cal. Sep. 14, 2016). "Seagate made no explicit promises as to the ongoing protection of personal information." *Id.* Yet the court found that, "in our day and age of data and identity theft, the mandatory receipt of Social Security numbers or other sensitive personal information would not imply the

---

[3] *See also Kaiser Found. Health Plan*, 2024 U.S. Dist. LEXIS 66733, at *61 (same where plaintiffs alleged an implied contract was created by virtue of the relationship between the parties, and defendant breached the implied contract by disclosing plaintiffs' patient status, personally identifiable data, and confidential communications to third parties); *In re BetterHelp, Inc. Data Disclosure Cases*, 2024 U.S. Dist. LEXIS 187442, at *9 (N.D. Cal. Oct. 15, 2024) (same, where plaintiffs alleged that they entered into contractual relationships with defendant, and that defendant's various promises of confidentiality were part of the terms of those contracts); *C.M. v. MarinHealth Med. Grp., Inc.*, 2024 U.S. Dist. LEXIS 10189, at *9 (N.D. Cal. Jan. 19, 2024) (similar); *Hameed-Bolden v. Forever 21 Retail, Inc.*, 2018 U.S. Dist. LEXIS 217868, at *9 (C.D. Cal. Oct. 1, 2018) (parties entered into an implied contract under which plaintiffs purchased goods and services and provided payment information in exchange for defendants providing goods and services and also agreeing to safeguard and protect their data); *Archambault v. Riverside Resort & Casino, Inc.*, 2025 U.S. Dist. LEXIS 176564, at *24 (D. Nev. Sep. 9, 2025) (allegations that "a meeting of the minds occurred when the [p]laintiffs provided their PII to [defendant] with the understanding that it would be adequately protected, and that [defendant's] implied duty to protect their PII was included in [its] own Privacy Policy" have been found sufficient by several courts in the Ninth Circuit) (collecting cases).

recipient's assent to protect the information sufficiently." *Id.* Accordingly, the court accepted the plaintiffs' allegation that Seagate had agreed to "take 'adequate measures' and make 'reasonable efforts' to 'properly safeguard[]' its employees personal identifying information." *Id*. at *31 (quoting the plaintiffs' complaint). The court went on to note that "[p]laintiffs' claim is a … realistic reflection of the mutual agreement that occurs in most data-sharing transactions: [w]hen a person hands over sensitive information, in addition to receiving a job, good, or service, they presumably expect to receive an implicit assurance that the information will be protected." *Id*. This mutual agreement is precisely what Plaintiff alleges here.

**ii. Plaintiff has alleged consideration.**

Defendants quibble with the terms of their implied contract with Plaintiff, arguing that Plaintiff purchased only "laser hair removal services" and not an "implied data privacy contract." *See* Mot. at 8:28-9:2. But the precise terms of the implied contract are a question of fact. *Castillo*, 2016 U.S. Dist. LEXIS 187428, at *31-32 (leaving for a "factfinder" to "determine whether an implied contract to protect adequately plaintiffs' information existed, and" the terms of such a contract). The Court cannot credit Defendants' theory of the contract terms on a motion to dismiss. *See Plaintiffs v. Walt Disney Co.*, No. 2:22-cv-01136-SB-SK, 2022 U.S. Dist. LEXIS 212169, at *15 (C.D. Cal. Sept. 16, 2022) (refusing to credit defendant's theory that the implied contract at issue only included compensation for novel ideas). At this juncture, Plaintiff sufficiently alleges that she paid – through money for services and through the value of the Sensitive Health Information she provided to Defendants – for an agreement not to disclose her Sensitive Health Information.

Again, "it is difficult to imagine how, in our day and age of data and identity theft, the mandatory receipt of…personal information would not imply the recipient's assent to protect the information sufficiently." *Id*. at *29. Rather, in similar contexts, "[t]here is an implicit agreement to safeguard the customer's information to effectuate the contract." *Irwin v. Jimmy John's Franchise, LLC*, 175 F. Supp. 3d 1064, 1070 (C.D.

Ill. 2016) (finding that there was an offer, acceptance, consideration, and a meeting of the minds when plaintiff provided his personal information to defendant to purchase food with the understanding that defendant would take reasonable measures to protect such information); *see also Kirsten v. Cal. Pizza Kitchen, Inc.*, 2022 U.S. Dist. LEXIS 206552, at *14 (C.D. Cal. July 29, 2022) (finding adequate consideration and denying motion to dismiss breach of implied contract claim where plaintiffs provided their PII to defendant as a condition of obtaining a job and with the expectation that defendant would protect their PII); *MarinHealth Med. Grp., Inc.*, 2024 U.S. Dist. LEXIS 10189, at *9 (same in the context of paid healthcare services and an ongoing relationship between the parties); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1144 (C.D. Cal. 2021) (same where plaintiffs gave their private information to defendants for purposes of obtaining genetic testing, with the understanding that defendants would take adequate measures to protect the information); *In re Zoom Video Communs. Privacy Litig.*, 525 F. Supp. 3d 1017, 1040 (N.D. Cal. 2021) (same where plaintiffs alleged they entered into implied contracts, separate and apart from Zoom's terms of service, under which Zoom agreed to and was obligated to take reasonable steps to secure and safeguard their sensitive information); *Plaintiffs v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1195 (D. Nev. 2022) (same where plaintiffs provided their PII to defendant as a condition of staying at its hotels, with the understanding that defendant would take adequate measures to protect the information).

To agree with Defendants, the Court would have to conclude that a contract to perform paid medical services cannot include an agreement to safeguard medical information. Defendants' cited authority does not support this wild claim. In *In re Linkedin User Privacy Litig.*, the plaintiffs held paid LinkedIn accounts, but LinkedIn's user agreement and privacy policy were the same for paying members and non-paying members. 932 F. Supp. 2d 1089, 1093 (N.D. Cal. 2013). Accordingly, the paying-plaintiffs could not allege consideration because "[a]ny alleged promise

LinkedIn made to paying premium account holders regarding security protocols was also made to non-paying members." *Id.* Similarly, in *Austin-Spearman v. AARP*, the court rejected the plaintiff's claim that her membership fee was tendered as consideration for defendant's promises in its privacy policy that applied to both members and non-members and noted that "a promise that is offered freely and equally to all people—without regard to who has provided consideration and who has not—is not a contract." 119 F. Supp. 3d 1, 11-12 (D.D.C. 2015). And in *Huynh v. Quora, Inc.*, the plaintiffs did not pay for Quora's services because they were free. 2019 U.S. Dist. LEXIS 235733, at *20 (N.D. Cal. Dec. 19, 2019). Here, in contrast, Defendants do not offer free services and treatments – all of Defendants' clients pay for all its services, including its implicit agreements. "[I]t is enough to allege that there was an … implicit contract for data security, that plaintiffs placed value on that data security, and that Defendants failed to meet their representations about data security." *In re Marriott Int'l, Inc.*, 440 F. Supp. 3d 447, 466 (D. Md. 2020).

**iii. Plaintiff Alleges Benefit-of-the-Bargain Damages.**

Plaintiff alleges the amount she paid for Defendants' services, which included their implied promise not to share her personal information, and that she would have expected to pay less for Defendants' services had she known that Defendants would share her personal information. *See* FAC ¶¶ 23, 86, 161. Plaintiff need not allege the exact amount of her overpayment at this stage. *Marriott*, 440 F. Supp. 3d at 466 ( It is "unnecessary at this stage to parse out what portion of the bargain between Plaintiff[] and [Defendants] can be attributed to data security.").

Courts have found benefit-of-the-bargain damages to be a viable form of damages where, as Plaintiff does here, plaintiffs allege that the disclosures or data breaches "diminished the value of their purchases." *In re Marriott*, 440 F. Supp. 3d at 466. In *Carlsen v. GameStop, Inc.*, for example, where a plaintiff paid for a subscription to a magazine published by the defendant which included a promise not to share subscribers' personal information with third parties and the defendant

allegedly shared this information with third parties anyway, the Eighth Circuit found that the plaintiff alleged an "actual injury" "in the form of devaluation of his … subscription in an amount equal to the difference between the value of the subscription that he paid for and the value of the subscription that he received, *i.e.*, a subscription with compromised privacy protection." 833 F.3d 903, 909 (8th Cir. 2016). Similarly, in *In re: Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1130 (N.D. Cal. 2018), the plaintiff alleged that Yahoo's email service had inadequate security, despite representations that it was secure. The plaintiff claimed "that he was damaged because he paid for services 'either worth nothing or worth less than was paid for them because of their lack of security.'" *Id.* The court found that these allegations were sufficient under a benefit of the bargain theory.

Thus Plaintiff has adequately alleged her damages stemming from Defendants' breach of their implied contract.

## IV. CONCLUSION

For the reasons stated herein, Plaintiff asks that Defendants' Motion be **DENIED**.

Dated: August 14, 2026

Respectfully submitted,

/s/ Alyssa Tolentino
Alyssa Tolentino (*pro hac vice*)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (212) 532-1091
E: *atolentino@sirillp.com*

Sonjay C. Singh (*pro hac vice*)
**SIRI & GLIMSTAD LLP**
400 East Pratt St. 8th Fl #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: *ssingh@sirillp.com*

Daniel Srourian, Esq. SBN 285678
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr. Suite 200
Beverly Hills, CA 90210
Tel: (213) 474-3800
Fax: (213) 471-4160
E: *daniel@slfla.com*

*Attorneys for Plaintiffs and the Putative Class*

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Plaintiffs hereby certifies that this brief contains 4,777 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 14, 2026

Respectfully submitted,

*/s/ Alyssa Tolentino*
Alyssa Tolentino (*pro hac vice*)

## CERTIFICATE OF SERVICE

The undersigned counsel of record for Plaintiffs hereby certifies that on August 14, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all attorneys of record.

Dated: August 14, 2026

Respectfully submitted,

*/s/ Alyssa Tolentino*
Alyssa Tolentino (*pro hac vice*)