UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:26-cv-01030-MWC-AGR Date: November 12, 2026

Title: Nicole Firlej, *et al.* v. Petrosian Esthetic Enterprises, LLC, *et al.*

Present: The Honorable Michelle Williams Court, United States District Judge

| T. Jackson | Not Reported |
| --- | --- |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: N/A | Attorneys Present for Defendants: N/A |

**Proceedings: (IN CHAMBERS) ORDER DENYING DEFENDANTS' MOTION TO DISMISS (DKT. [65]) AND VACATING HEARING**

Before the Court is Defendants Petrosian Esthetic Enterprises, LLC and SEC Laser Aesthetics Chicago, LLC's ("SEV") (collectively, "Defendants") Motion to Dismiss the Second Amended Complaint ("SAC") ("motion"). Dkt. # 65 ("*MTD*"). Plaintiff Hania Rouhani ("Plaintiff" or "Rouhani") opposed the motion, Dkt. # 66 ("*Opp'n*"), and Defendants replied, Dkt. # 67 ("*Reply*"). The Court finds this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. After considering the papers, the Court **DENIES** Defendants' Motion to Dismiss and **VACATES** the November 20, 2026 hearing.

I. Factual Background[1]

This putative class action arises after Plaintiff Rouhani utilized Defendant SEV's website ("the Website") to schedule a laser hair removal appointment with SEV's clinic. *See* Dkt. # 61 ("*SAC*") ¶¶ 21–23. The SAC alleges as follows:

[1] All factual allegations are derived from the SAC. Because Defendants only move to dismiss Plaintiff Rouhani's claim brought under the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 360, *et seq.*, the Court narrows its recitation of the background and procedural history accordingly. A more detailed factual summary of the case can be found in the Court's June 18, 2026, Order resolving Defendants' first motion to dismiss. *See* Dkt. # 37 at 2–3, *also located at Firlej v. Petrosian Esthetic Enters., LLC*, No. 2:26-01030-MWC-AGR, 2026 WL 2464312, at *1–2 (C.D. Cal. June 18, 2026).

"Google is the largest digital advertiser in the country." *Id.* ¶ 34. Google advertises "Google Analytics and other Business Tools to website operators, like Defendants," which allow website operators to "'monitor activity on [their] website as it happens.'" *Id.* ¶¶ 35–36 (emphasis omitted) (citations omitted). "But, in order to get those insights and benefits, website operators like Defendants, add or embed a small piece of Google Analytics Pixel measurement code into each page of its website that it wishes to track information."[2] *Id.* ¶ 37.

When a user accesses a website hosting Google Analytics, the Pixel code "surreptitiously reads and analyzes the user's communications sent from the user's browser to the host website while those communications are in transit to the host website." *Id.* ¶ 38 (emphasis omitted). The Pixels analyze and interpret the contents of the user's transmissions "in real time" to select what portions of the communications Google processes for its analytics and advertising purposes. *Id.* "In essence, the Google Analytics Pixel code intercepts, reads, and analyzes the substantive content of a user's interactions and communications while they are in transit to the host webpage." *Id.* ¶ 39. This information is then directed to Google "for additional processing, including aggregating and organizing the data based on particular criteria." *Id.* ¶ 41. Google then organizes the user information that it collects from third-party websites into "advertising profiles" consisting of the entirety of a given user's collected data. *Id.* ¶ 42. With these profiles, Google "can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events . . . , political affiliation, education level, home ownership status, marital status, household income, type of employment," etc. *Id.* ¶ 42.

A. <u>How the Pixels Read and Transmit User Data</u>

Every website is hosted by a computer "'server' that holds the website's contents." *Id.* ¶ 57. To access a website, individuals must use "web browsers," which are "software

[2] Pixels are small pieces of code placed into a website or advertisement. *See SAC* ¶ 54. Pixels track user behavior, such as "purchases, clicks, or pageviews" and can collect "a shocking amount of information regarding an individual's online behavior," including the webpages a user visits, the amount of time spent on a specific webpage, the "buttons and hyperlinks that the user clicks while using a website," the items the user adds to an online shopping cart, and more. *See id.* ¶¶ 54–55.

applications that allow consumers to navigate the webs and view and exchange electronic information and communications over the Internet." *Id.* ¶ 58. Communications between a website's server and a web browser consist of "Requests and Responses." *Id.* ¶ 59. "A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information," such as the website page's images, words, buttons, and other features. *See id.*

On most websites, the Response sent back to the user's web browser "directs the browser to create small files known as 'cookies' on the user's device." *Id.* ¶ 60 (citation omitted). The user's web browser saves the cookies and uses them to identify the website user as they browse the website. *Id.* For instance, a cookie may allow the website to remember a user's login information, language settings, or shopping cart contents. *Id.* "When a Google user logs onto their account, their webs browser records a Google tracking cookie," which links the web browser to the user's Google account. *See id.* ¶ 61.

Google's Tracking Tools send transmissions from a user's browser that are accompanied by certain "identifiers" used to organize the transmitted information. *Id.* ¶ 62. "One of those identifiers is the client identifier, which is transmitted as the 'cid' parameter, which associates the transmitted information with a particular browser, device and, where the user is signed in to a Google account, with a specific Google account." *Id.* The other identifier is the "session identifier ('Session ID')," which is "transmitted as the 'sid' parameter and associates the transmitted information with a 'session,' which is a period of time during which a user interacts with an operator's website or [application]." *Id.* A session begins when the user starts interacting with the website and the session remains open for the duration of that interaction. *Id.* ¶ 63. Every transmission the Tracking Tools make during that session carries the same Session ID. *Id.*

Google's Pixels therefore use cookies to acquire information from the browser without notifying the user. *See id.* ¶ 66. The Pixels read and relay user information "contemporaneously as the website user navigates the website." *Id.* "Google Pixels do not, however, merely copy a completed communication and forward it." *Id.* ¶ 67. Instead, the Pixel's code "reads and analyzes the content of the user's interactions with the website in real time, as the user makes them, and while the user's communications are in transit to the website operator's own servers." *Id.* The Pixels interpret the content of the code to determine which portions of the communication the Pixels will capture. *Id.* "The reading

and selection are both complete before the user's communication has reached the website operator." *Id.*

B. Defendants' Website

To schedule or re-schedule an appointment with Defendants' "clinicians," Plaintiff was required to complete a scheduling form through Defendants' Website. *Id.* ¶ 74. Unbeknownst to Plaintiff, Defendants "intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Health Information [('SHI')] communicated through the Website to third parties, including Google." *Id.* ¶ 75. When patients browse Defendants' services and schedule an appointment on the Website, the Tracking Tools transmit the patient's SHI, including the fact that the patient has scheduled an appointment, the reason for the patient's appointment, and the patient's identity. *See id.* ¶¶ 76–77, 79.

"The reading, analysis, and selection performed by the Tracking Tools installed on the Website occur while patients like Plaintiff[] complete the appointment scheduling form" and before they submit it. *Id.* ¶ 78. The Tracking Tools read the contents of a patient's form selection entries "as they are made." *Id.* "By the time the patient's communication has been delivered to Defendants, Google has already read the [SHI] that the communication contains." *Id.*; *see also id.* ¶ 83 ("Google reads and learns the contents of Plaintiffs' and Class Members' communications with Defendants while those communications are in transit to Defendants' servers, and before the transmission of that content to Google is complete.").

The Tracking Tools installed on the Website were invisible to Plaintiff. *Id.* ¶ 87. Defendants did not inform Plaintiff they were sharing Plaintiff's SHI with third parties, including Google. *Id.* ¶ 84. Defendants did not present Plaintiff with a disclaimer or warning that her SHI would be disclosed to any unauthorized third parties without her express consent. *Id.* ¶ 88.

II. Procedural History

On February 2, 2026, Plaintiff Rouhani filed the original Complaint against Defendants, asserting six causes of action: (1) invasion of privacy; (2) negligence; (3) breach of implied contract; (4) unjust enrichment; (5) violations of the Electronic

Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2511(1), *et seq.*; and (6) violations of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 360, *et seq.* *See* Dkt. # 1 at 46–63. Defendants moved to dismiss all six claims, Dkt. # 28, and on June 18, 2026, the Court granted in part and denied in part Defendants' motion, dismissing only Plaintiff's claims for breach of implied contract and CIPA violations. *See* Dkt. # 37 at 8–14. The Court held that the original Complaint plausibly alleged that the Tracking Tools transmitted the "contents" of her communications under CIPA but failed to adequately allege that Defendants "read" the communications while "in transit," *id.* at 6–8. The Court therefore dismissed Plaintiff's CIPA claim with leave to amend. *Id.* at 8.

On July 9, 2026, Plaintiff filed her First Amended Complaint ("FAC"). Dkt. # 40 ("*FAC*"). The FAC alleged the same six claims as the initial Complaint, alleging that Google "read[s]" and "analyze[s]" Plaintiff's SHI. *See, e.g.*, *id.* ¶¶ 17, 210. On July 23, 2026, Defendants moved to dismiss the FAC, seeking to dismiss only Plaintiff's CIPA and breach of implied contract claims. Dkt. # 45. On August 31, 2026, the Court granted Defendants' motion and dismissed Plaintiff's breach of implied contract claim without leave to amend and dismissed Plaintiff's CIPA claim with leave to amend. *See* Dkt. # 60. at 10–13. Regarding the FAC's CIPA claim, the Court concluded the FAC failed to plausibly allege Defendants' Tracking Tools "read" the contents of Plaintiff's data "while in transit." *See id.* at 5–10. Specifically, the Court concluded:

1. The FAC's allegations that Google "read[s]" and "analyze[s]" information transmitted by the Tracking Tools and that Google "learned the contents of Plaintiff Rouhani's communications" were conclusory and merely tracked the language of CIPA, *see id.* at 7;

2. Notwithstanding the FAC's conclusory allegations, the FAC failed to adequately allege a process of simultaneous reading "while in transit," and instead, chronicled a process of first, collection of patient data, and then second, transmission of such data back to Google, *see id.* at 8–10;

On September 21, 2026, Plaintiff filed the operative SAC, asserting six causes of action: (1) invasion of privacy; (2) negligence; (3) unjust enrichment; (4) violations of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:26-cv-01030-MWC-AGR Date: November 12, 2026

Title: Nicole Firlej, *et al.* v. Petrosian Esthetic Enterprises, LLC, *et al.*

ECPA; (5) violations of Section 631(a) of CIPA; and (6) violations of the Illinois Eavesdropping Act, 720 Ill. Comp. Stat. 5/14-1, *et seq.* *See SAC* at 53–72. On October 6, 2026, Defendants filed the instant motion, seeking dismissal of the SAC's CIPA claim alone. *See generally MTD*. The motion is fully briefed and ripe for consideration and disposition. *See Opp'n*; *Reply*.

III. Legal Standard

A. Rule 12(b)(6)

A defendant may move to dismiss a claim in the plaintiff's complaint if the allegation "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "At the pleading stage, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell At. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

As such, the plausibility standard is a "context-specific task that requires the reviewing court to [1] draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679, and [2] to "'draw all reasonable inferences in favor of the non-moving party.'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014)). "Ultimately, dismissal is proper under Rule 12(b)(6) if it appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Id.* at 773–74 (internal citation and quotation marks omitted) (internal brackets, quotation marks, and citation omitted). However, "[c]onclusory allegations and unreasonable inferences do not provide [ ] a basis" for determining a plaintiff is entitled to relief. *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 954 (9th Cir. 2023) (citation omitted); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) ("The court is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (internal quotation marks, brackets, and citation omitted). Nor may the Court accept legal conclusions and threadbare recitals of the elements of a cause of action. *Malheur Forest*

*Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 723 (9th Cir. 2026) ("Plausibility requires pleading facts, as opposed to conclusory allegations or the formulaic recitation of the elements of a cause of action, and must rise above the mere conceivability or possibility of unlawful conduct that entitles the pleader to relief.") (citation omitted); *Detwiler v. Mid-Columbia Med. Ctr.*, 156 F.4th 886, 893 (9th Cir. 2025); *Doe I v. Cysco Sys., Inc.*, 73 F.4th 700, 713 (9th Cir. 2023) ("Although a reviewing court must accept a complaint's factual allegations as true, the same is not true of legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (internal quotation marks, brackets, and citation omitted), *rev'd on other grounds sub nom.*, *Cisco Sys., Inc. v. Doe I*, 609 U.S. 141 (2026).

IV. Discussion

California Penal Code section 631 creates four alternative avenues of liability for any person

> [1] [W]ho, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or
>
> [2] [W]ho willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or
>
> [3] [W]ho uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or

> [4] [W]ho aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section[.]

Cal. Penal Code § 631(a); *see also Krzyzek v. OpenX Techs., Inc.*, 817 F. Supp. 3d 857, 865–66 (N.D. Cal. 2026). As explained in the Court's June 18, 2026, Order, Plaintiff's CIPA theory rests on the derivative liability found in the fourth subclause of Section 631(a), by way of the second and third clauses. *See* Dkt. # 37 at 7.

Defendants now move to dismiss Plaintiff's CIPA claim on several grounds, arguing the SAC fails to plausibly allege Defendants "read" the contents of Plaintiff's communications "while in transit." *See generally MTD*. The Court address both CIPA prongs below.

*i. CIPA's Reading Requirement*

Defendants move to dismiss the SAC's CIPA claim for failing to plausibly allege CIPA's "reading" requirement. *See MTD* at 10–15. "Reading or learning the contents of a communication requires 'some effort at understanding the substantive meaning' of the communication." *Doe v. Eating Recovery Ctr.*, 806 F. Supp. 3d 1109 (N.D. Cal. 2025) (quoting *Williams v. DDR Media, LLC*, 757 F. Supp. 3d 989, 995 (N.D. Cal. 2024)); *Torres v. Prudential Fin., Inc.*, No. 22-cv-07465 (CRB), 2025 WL 1135088, at *5 (N.D. Cal. Apr. 17, 2025) (same).

Defendants first argue the SAC has merely "relabel[ed]" or "[s]wapp[ed] out" the FAC's allegations that the Tracking Tools "collect[ed]" Plaintiff's SHI for allegations that the Tools were "configured to read and analyze the content" of her communications, but that such changes are "stylistic" and conclusory. *MTD* at 12–13; *see also Reply* at 6–7 (same). Though the Court cannot accept conclusory allegations that merely track the language of CIPA, *see* Dkt. # 60 at 7, here, the SAC cures the FAC's deficiencies.

For instance, the SAC explains the process of how Google's Tracking Tools read and collect user data. The SAC alleges the Tracking Tools send transmissions from a user's browser "accompanied by identifiers that Google uses to organize the transmitted information," such as a "'cid' parameter," which associates the transmitted information with a particular browser, device, and Google account, and a "'sid' parameter," which

associates the transmitted information with a browsing "session." *See SAC* ¶ 62. "Together the 'cid' and 'sid' cookies allow Google to not just identify a specific user, but rather identify a specific visit made by a specific user to a specific website for a specific purpose." *Id.* ¶ 65. The Pixels use these cookies to "acquire information from the browser without notifying the user." *Id.* ¶ 66; *see also id.* ¶ 69 ("[T]he Pixel attaches to [the user's communications] the identifying information acquired from the Google cookies . . . and directs the browser to transmit the resulting package to Google."). Then, the SAC explains why Defendants desire this information—to create "advertising profiles consisting of all of the data that [Google] has collected" and "enable[] advertisers to target Plaintiffs and Class Members with relevant content or advertisements using the [SHI] that Google harvested." *Id.* ¶¶ 42, 83.

Because the SAC alleges both how and why the Tracking Tools read Plaintiff's data, such allegations are not conclusory. *See L.B. v. LinkedIn Corp.*, No. 5:24-cv-06832-EJD, 2025 WL 2899514, at *16 (N.D. Cal. Oct. 10, 2025) (explaining that to adequately allege CIPA's reading requirement, a complaint must plead "facts that create a coherent story of how [the defendant] read the specific communications between them and the websites they visited."); *see also Love v. Ladder Fin., Inc.*, No. 23-cv-04234-VC, 2024 WL 2104497, at *2 (N.D. Cal. May 8, 2024) ("There is no coherent story of how or why FullStory would learn such granular information about users of one [of] its customers' sites—information that has nothing to do with its alleged service or stated uses of consumer data."); *R.C. v. Sussex Publishers, LLC*, No. 24-cv-02609-JSC, 2025 WL 1735994, at *5 (N.D. Cal. June 23, 2025) (reciting allegations of *how* Google Analytics reads and interprets data while it is in transit, explaining, "Plaintiffs here plausibly allege Google Analytics analyzes communications as they are sent, filtering data to be used for advertising purposes from that which will not.").

Defendants' next two arguments maintain the SAC fails to allege Defendants read the "contents" of Plaintiff's communications, as opposed to "record information." *See MTD* at 13. For instance, Defendants contend that by transmitting "a user identification number and a session identification number," the Tracking Tools only transmit "information corresponding to when a user accessed a website such as a Session ID," as opposed to the contents of a user's identifying information. *See id.* Similarly, Defendants argue the SAC's allegations describing the Pixel's "selection function" indicate the Pixel is only capturing "clicks on a webpage," as opposed to the "contents" of communications. *See id.* at 14–15; *see also SAC* ¶ 68 ("The Pixel's selection function requires it to

understand the substantive meaning of what the user has communicated. . . . The code . . . distinguishes among [the communications'] contents, retaining what matches the parameters its operator has configured and disregarding what does not.").

"Under CIPA, only any information concerning the substance, purpose, or meaning of a communication is protected." *Heiting v. Taro Pharms. USA, Inc.*, 728 F. Supp. 3d 1112, 1123 (C.D. Cal. 2024) (internal quotation marks, brackets, and citation omitted). "The term 'content' refers to the intended message conveyed by the communication; content does *not* include 'record information,' or the 'characteristics of the message that is generated in the course of the communication.'" *Id.* (emphasis in original) (quoting *Graf v. Zynga Game Network, Inc. (In re Zynga Privacy Litig.)*, 750 F.3d 1098, 1106 (9th Cir. 2014)). Generally, "record information" includes, "among other information, 'the name, address, and subscriber number or identity of a subscriber or customer.'" *Id.* (quoting *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 517 (C.D. Cal. 2021)).

Here, the Court has already addressed this argument when evaluating Plaintiff's initial Complaint, concluding, in relevant part: "[E]ven if Defendants are correct that basic 'record information' does not qualify as 'contents,' the [initial Complaint] alleges that the Tracking Tools transmitted more than merely Plaintiff's contact information or browsing settings or data. Plaintiff has therefore plausibly alleged that the Tracking Tools transmitted the 'contents' of her communications. . . . " *See* Dkt. # 37 at 7 (citations omitted).

As the original Complaint did, the SAC, too, alleges the Tracking Tools installed on Defendants' Website transmitted "the fact that the patient has scheduled an appointment and the reason for the patient's appointment." *See SAC* ¶ 76; *see also id.* ¶¶ 78 ("When a patient selects the service or treatment sought and states the reason for the appointment, the Pixel code reads the content of those entries as they are made."), 79 (alleging the Tracking Tools transmit "the actual content of the patient's entries and selections – the specific treatment or service the patient sought, and the reason the patient gave for seeking it."), 80 (same). The SAC further alleges the Pixel's "selection function" must "evaluat[e] the content of the interaction itself" to determine whether a user's interaction on the Website matches the "parameters its operator has configured." *SAC* ¶ 68. Thus, the SAC does not allege the Pixel's "selection function" only records "clicks on a webpage," but instead, alleges the "selection function" actually analyzes a user's interaction with the webpage. The SAC therefore plausibly alleges Defendants read the "contents" of Plaintiff's communications. *See Eating Recovery*, 806 F. Supp. 3d at 1116 (concluding

that URLs which "reveal that Doe researched anorexia, explored treatment options and locations, and at least clicked through to a self-assessment form" revealed "enough information to be deemed contents of communications" because such information "conveys far more than basic identification and address information"); *Doe v. Tenet Healthcare Corp.*, 789 F. Supp. 3d 814, 837 (E.D. Cal. 2025) (plaintiffs adequately alleged contents of a communication where they pleaded "the searches they conducted regarding their personal health conditions, treatment options, and doctors"); *Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 976 (S.D. Cal. 2023) (plaintiffs plausibly conveyed "content" to state a CIPA claim where they alleged "that their data included personal search queries—such as specialty healthcare providers and treatments for medical conditions," including their PHI).

Because the SAC adequately alleges CIPA's "reading" requirement, the Court **DENIES** Defendants' motion on this basis.

*ii. CIPA's In-Transit Requirement*

Defendants next challenge the plausibility of the SAC's "while in transit" CIPA allegations. *See MTD* at 15–18.

First, Defendants argue the SAC alleges "that Google intercepted [Plaintiff's] communications *before* she transmitted them," as opposed to during the transmission. *See id.* at 16 (emphasis in original). Specifically, Defendants point to the SAC's allegations that "the Google Code intercepted [Plaintiff's] communications 'before she submitted her application form.'" *Id.* (quoting *SAC* ¶¶ 17 & 24).

CIPA prohibits a defendant—or a party who aids or conspires with another party—from reading or learning "the contents or meaning of any message, report, or communication while the same is in transit[.]" Cal. Penal Code § 631(a). The focus of the inquiry is therefore not on when Plaintiff "submitted" her application form, but on when Google read the contents of Plaintiff's SHI. *See id.*; *St. Aubin v. Carbon Health Techs., Inc.*, No. 24-cv-00667-JST, 2024 WL 4369675, at *6 (N.D. Cal. Oct. 1, 2024) ("'While' implies that the interception must occur contemporaneously with the sending or receipt of the message."). "Allegations that communications are intercepted in real time through the use of computer code provides sufficient factual detail to support the 'in transit' requirement." *Tenet Healthcare Corp.*, 789 F. Supp. 3d at 838 (quotation marks, brackets, and citations omitted).

Here, the SAC alleges, in relevant part, that "[t]he Pixel's code reads and analyzes the content of the user's interactions with the website *in real time*, *as the user makes them*, and while the user's communications are in transit to the website operator's own servers." *See SAC* ¶ 67 (emphases added); *see also id.* ¶¶ 38–39 (similar allegations), 69 ("[T]he Pixel's code reads, parses, and analyzes the substantive content of the user's interaction with the website . . . while those communications are in transit to the website operator's servers, . . . "), 83 (similar allegation). Even paragraphs 17 and 24 of the SAC, which Defendants cite in support of their argument, allege simultaneous reading with transmission. *See id.* ¶ 17 ("[T]he Tracking Tools installed on the Website read and analyzed the content of Plaintiff Firlej's entries, . . . while her communication was in transit to Defendants' servers and before she submitted her appointment form."), 24 (same allegation pertaining to Plaintiff Rouhani). The SAC therefore does not allege interception *before* transmission, but instead, alleges that Google simultaneously read the contents of Plaintiff's communications as she was filling out Defendants' patient form. *Cf. St. Aubin*, 2024 WL 4369675, at *7 (N.D. Cal. Oct. 1, 2024) ("[T]he key to the interception analysis is whether the plaintiff alleges that transmission was simultaneous.") (citations omitted). Defendants' first argument lacks merit.

Next, Defendants argue the SAC's "in transit" allegations fail because the SAC alleges the Tracking Tools sent a "separate 'package' to Google" *after* the Tools selected the relevant contents of Plaintiff's communications. *See MTD* at 17. Defendants therefore argue the SAC "alleges only Google's 'subsequent receipt, storage, aggregation, and use of that content.'" *Id.* (citing *SAC* ¶ 83).

A complaint must allege that the defendant "read [the plaintiff's] communications during their transmission, as opposed to once the communications were placed in electronic storage." *L.B.*, 2025 WL 2899514, at *16; *see also Goldstein v. Rumble Inc.*, No. CV 25-06304-MWF (SKx), 2026 WL 1406766, at *5 (C.D. Cal. Apr. 24, 2026) (same). As explained above, the SAC explains a process whereby Google reads the contents of Plaintiff's communications "in real time" and "as the user makes them." *SAC* ¶ 67. Though Defendants challenge the plausibility of paragraph 83 of the SAC, arguing this paragraph demonstrates "post-transit conduct that cannot support a § 631 claim," *see MTD* at 17, paragraph 83 of the SAC alleges "Google reads and learns the contents of Plaintiff's and Class members' communications with Defendants *while* those communications are in transit to Defendants' servers[.]" *SAC* ¶ 83 (emphasis added). The SAC clarifies that "Google's subsequent receipt, storage, aggregation, and use of that content are what

Google does with communications *it has already read*, they are *not* the moment at which Google first reads them." *Id.* (emphases added). Because the SAC no longer describes a process of collection and *then* transmission, but instead, alleges a process of simultaneous reading and transmission, Defendants' second argument fails.

Finally, Defendants argue the SAC indicates Google did not make an effort to understand the contents of Plaintiff's communications because Google did not compile Plaintiff's data or create "advertising profiles" until after completion of the transmission. *See MTD* at 17 ("Ads received '[a]fter' Ms. Rouhani provided her information, SAC ¶ 27, are fully consistent with post-transit processing on Google's servers. . . . These allegations therefore describe reading after, not during, transit.") (alterations in original). The SAC alleges that after reading the content of Plaintiff's communications while they are in transit to Google's web servers, "Google then organizes the user information that it collects . . . into 'advertising profiles' consisting of all of the data that it has collected and analyzed about a given user." *SAC* ¶ 42. With these advertising profiles, "Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events," etc. *Id.*

The SAC alleges, however, that this organization and compilation of user data only occurs *after* Google's Pixel has read, analyzed, and intercepted the substantive contents of a user's interactions and communications with the webpages visited. *See id.* ¶¶ 39, 41 ("All the information collected by the Google Analytics Pixel code, which was first intercepted, read, and analyzed while it was in transit to the host website, *is then directed* to Google for additional processing, including aggregating and organizing the data based on particular criteria.") (emphasis added). The SAC's explanation of Google's additional processing of user data does not undermine the SAC's numerous allegations that the Tracking Tools read the contents of Plaintiff's communications while they are in transit to Google's servers. *See, e.g.*, *SAC* ¶ 67 (alleging Google's Pixel reads and analyzes the content of user's interactions with the website "in real time, as the user makes them, and while the user's communications are in transit to the website operator's own servers"); *id.* ¶¶ 38–39 (similar allegations), 41 (similar allegation), 69 (similar allegation), 83 (similar allegation). For this reason, Defendants' final argument also fails.

For these reasons, Defendants' Motion to Dismiss is **DENIED**. Within <u>fourteen (14) days</u> of this Order, Defendants **SHALL** file an Answer or other responsive pleading to the SAC. *See* Fed. R. Civ. P. 12(a)(4)(A).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:26-cv-01030-MWC-AGR Date: November 12, 2026

Title: Nicole Firlej, *et al.* v. Petrosian Esthetic Enterprises, LLC, *et al.*

V. Conclusion

For the foregoing reasons, the Court **ORDERS** as follows:

1. Defendants' Motion to Dismiss the Second Amended Complaint (Dkt. # 65) is **DENIED.**

2. Defendants **SHALL** file an Answer or other responsive pleading to the SAC **within fourteen (14) days** after issuance of this Order.

3. The November 20, 2026 hearing is **VACATED**.

**IT IS SO ORDERED.**

:

**Initials of Preparer** TJ